BARNHART, Respondent v. HERSETH, Appellant

(222 N.W.2d 131)

(File No. 11537. Opinion filed October 3, 1974)

Horace R. Jackson and Fred M. Winkler of Lynn, Jackson, Shultz, Ireland & Lebrun, Rapid City, for petitioner and respondent.

Kermit A. Sande, Atty. Gen., and Marvin D. Truhe, Asst. Atty. Gen., Pierre, W. A. McCullen and Allen G. Nelson of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for defendant and appellant.

## HISTORY

For many years constitutional revision has been a recognized necessity for the State of South Dakota. On January 21, 1969, the governor impressed upon the joint session of the South Dakota Legislature the need for a comprehensive constitutional revision program. He noted that "We cannot run government in 1969 on the rule book of 1889 and you cannot continue with a patchwork job on the leaky roof of our basic law. Therefore, I recommend this session initiate the needed steps for a realistic revision of our outdated state constitution." 1969 S.J. 31.

The next day Senate Bill No. 1, "A BILL FOR AN ACT ENTITLED, An Act creating a constitutional revision commission

to make a comprehensive study of the Constitution of this state" was introduced in the senate. 1969 S.J. 40. The bill was later referred to the senate committee on state affairs and public institutions and was reported back to the senate with a recommendation "that as so amended said Bill do pass." 1969 S.J. 204-5. Senate Bill No. 1 passed the senate 35 to 0, 1969 S.J. 236, and was sent to the house where it was further amended and passed 65 to 1. 1969 H.J. 793.

Senate Bill No. 1 was returned to the senate which concurred in the house amendments and passed the bill 31 to 4. 1969 S.J. 646. The bill was delivered to the governor on March 12, 1969, 1969 S.J. 711, and became Ch. 225 of the 1969 Session Laws.

Section 2 of that act provides:

"Section 2. The Commission shall consist of thirteen members to be appointed as follows:

(a) Three by the presiding officer of the South Dakota Senate from members thereof, no more than two of whom shall be from one political party;

(b) Three by the presiding officer of the South Dakota House of Representatives from members thereof, no more than two of whom shall be from one political party;

(c) Three by the Governor of South Dakota, each of whom must be residents of the state and no more than two of whom shall be from one political party;

(d) Two by the presiding Judge of the Supreme Court of South Dakota from the members in good standing of the State Bar of South Dakota, one of whom may be a judge of a court of record in this state;

(e) The Chairman of the Department of History and Political Science at South Dakota State University and the Chairman of the Department of Government at the University of South Dakota shall serve as members of the Commission."

Section 5 provides:

> "Section 5. The Commission shall report its findings and recommendations in the form of proposed amendments to the Constitution to the Legislature of the State of South Dakota at its regular sessions until by act of the legislature the Commission is discharged."

In that same address to the joint session, the governor requested a statute allowing the governor's office to submit executive reorganization plans for legislative approval. "By passing this legislation, we can make a commitment either for or against greater efficiency in government." 1969 S.J. 31. This proposal did not become law but its subject was seriously discussed by the constitutional revision commission which commenced its work in November 1969.

At the commission's third meeting in April of 1970, the constitution was divided into eleven areas for study, and two members were assigned the executive article.[1] At the next meeting a new executive article that would have retained the superintendent of public instruction as a constitutional office was proposed.[2] At that meeting also, the commission was reorganized into three larger committees with one of these committees assigned to the executive article and various other subjects.[3]

In the meantime a new governor had been elected who echoed his predecessor on the need for constitutional reform in the following manner:

> "I believe that the proper approach to constitutional revision is to prepare a series of related amendments to be identified as a package so that the public may better understand this complex area. * * * I have discussed this topic with the (constitutional revision) commission * * *. I recommend that this legislature await the recommendations of the commission and

---

1. Minutes, constitutional revision commission, April 17-18, 1970, at 21-22.

2. Minutes, constitutional revision commission, September 3-5, 1970, at 7.

3. Id. at 45-46.

act in the next session to place any resulting amendments on the ballot. I further recommend that this legislature instruct the commission to prepare packages in the areas of the executive branch and local government structure. Priority attention should be given these areas, because revision of these sections of the Constitution will provide for more efficient, responsive and flexible government. * * * These areas are *vital* to this administration's program of evaluation and reform." [4]

In March of 1971, House Concurrent Resolution No. 528, which passed the house by 69 to 1 [5] and the senate by 31 to 0 [6] directed the commission to submit a new executive article to the legislature. [7] Because of this resolution, the commission focused even more closely on a new executive article in March of 1971, and did reach a consensus that a number of the constitutional officers should be appointed by the governor. [8] In May several constitutional officers, *including the respondent,* appeared before the commission in opposition to that consensus, [9] and, finally, the draft executive article that was eventually sent to the legislature was presented to the commission in August of 1971. With respect to section 9 (now section 7) of the draft article, the minutes show that one of the members

"recommended the deletion of superintendent of public instruction as a constitutional office. There is no centralized system of secondary and elementary education in the state. He feels that the Commissioner of the Board of Regents is more important even though he has

4.   1971 S.J. 42-43.

5.   1971 H.J. 1071.

6.   1971 S.J. 1056.

7.   "WHEREAS, constitutional provisions relative to the executive branch need revision to insure responsive state government * * *

"NOW, THEREFORE, BE IT RESOLVED * * * that the South Dakota Constitutional Revision Commission prepare packages of interrelated amendments for consideration by the * * *Legislature of the state of South Dakota." 1971 H. J. 1017-18.

8.   Minutes, constitutional revision commission, March 30-31, 1971, at 9.

9.   Minutes, constitutional revision commission, May 6-7, 1971, at 5-6.

no constitutional base. The Board of Regents carries on a functional responsibility for state government. The state does not have that responsibility in primary and secondary education. The financing of this system is on the county basis.".

It was then moved and seconded

"THAT THE 'SUPERINTENDENT OF PUBLIC IN-STRUCTION' * * * BE DELETED. MOTION PREVAILED."[10]

Input was received from every department of government affected by this amendment; by any and all business and civic groups having an interest; and by all individuals who wished to appear and be heard. The commission continued to discuss and modify the new article in the light of the information received, and final approval was given by the commission in December 1971.[11]

The new article was sent to the legislature and emerged as House Joint Resolution 513 with no change made in the deletion of the superintendent of public instruction.[12] House Joint Resolution 513 passed the house on a 64 to 0[13] vote and the senate by 33 to 0.[14] The ballot was prepared with an explanatory statement by the attorney general, and the question was ready to be presented in the November 1972 election. For the purposes of SDCL 12-13-9 through 12-13-12, as related to this proposition, the attorney general's statement on the ballot and voting machines as published and which is a part of the controversy was as follows:

"EXPLANATORY STATEMENT BY THE ATTORNEY GEN-ERAL:

10. Minutes, constitutional revision commission, August 9-10, 1971, at 14-15.

11. Minutes, constitutional revision commission, December 4, 1971, at 3.

12. Minutes, constitutional revision commission, March 17, 1972, at 2.

13. 1972 H.J. 1101-02.

14. 1972 S.J. 803.

"This proposal replaces Article IV of the South Dakota Constitution relating to the·Executive Department. The major changes proposed:

Effective 1975, a four-year term for Governor and other Constitutional Officers. Governor and Lieutenant Governor to be elected as a team and limited to two consecutive terms.

Reduction in State Government Departments to no more than 25.

Reorganization of departments of State Government by Governor unless disapproved by either House of Legislature.

A vote 'YES' will adopt the new Executive Article and change the Constitution. A vote 'NO' retains the present Executive Article, leaving the Constitution as it exists."

The proposed amendment received widespread publicity in all of the news media, and was the subject of intense public and private discussion preceding the submission of the amendment. The new executive article passed by a margin of 182,248 to 96,944 [15] at the polls in 1972.

PER CURIAM.

## DECISION

This is an appeal from a judgment and the issuance of a peremptory writ of mandamus by the Hughes County Circuit Court. The trial court ordered the appellant, Lorna Herseth, as secretary of state, to certify respondent Donald Barnhart's name on the 1974 ballot as a candidate for the office of superintendent of public instruction, for the reasons that (1) the entire amendment revising Article IV of the Constitution is invalid in that it violates § 1 of Article XXIII (1889) [16] of the South Dakota

15. South Dakota Constitution, Article IV, Historical Note (1974 Supp).

16. Prior to its own amendment in November 1972, Article XXIII provided that: "if more than one amendment be submitted they shall be submitted in such manner that the people may vote for or against such amendments separately."

Constitution because it was presented as one amendment although it covered more than one subject, and (2) the attorney general's explanatory statement that appeared on the ballot and voting machines in 1972 was actively misleading and was also deficient under SDCL 12-13-9 in that the statement failed to mention the abolition of the constitutional office in question. Defendant Herseth appeals from the whole of the judgment. We reverse.

■ The effect of the challenged amendment was to revise and supplant our former executive article. In so doing, the amendment made more than twenty changes in the structure of the executive branch. Among these changes were four-year instead of two-year terms for the governor, lieutenant governor, attorney general, secretary of state, auditor, treasurer, and commissioner of school and public lands; provision that the governor and lieutenant governor would run as a team; restriction of the governor and lieutenant governor to two consecutive terms; reduction in state government departments to no more than twenty-five, exclusive of constitutional offices; deletion of a restriction on consecutive terms by the state treasurer; and the abolition of respondent's constitutional office by deleting it from the list of constitutional officers. The amendment also gave the governor the power to convene either house of the legislature separately; extended time limitations on the governor's veto power; gave the governor power to correct errors in legislative bills and placed reorganization primarily in the hands of the governor. Thus, the challenged amendment is a multi-change amendment, but we hold that this is not determinative of invalidity under § 1 of Article XXIII (1889).

■ The purpose of the amendment was to engender greater efficiency and responsibility in the executive branch of state government by gathering a multitude of independent boards and commissions under the control of the governor, and to eliminate unnecessary offices and burdensome restrictions on remaining offices. The changes submitted in the 1972 amendment are all rationally related to this general purpose.

We find precedent for this decision in the leading South Dakota case on the subject. State ex rel. Adams v. Herried, 1897,

10 S.D. 109, 72 N.W. 93, involved a similar challenge to a constitutional amendment that (1) changed the number and powers of the regents of the state educational institutions, and (2) abolished the trustees of those various state institutions. The court held that the amendment was not defective, stating:

> "either (abolition of the trustees, or the change in the number and powers of the regents) might have been adopted without adopting the other; and * * * there are numerous reasons why an elector might have desired one change, and not the other. The defect in this argument consists in substituting for the real object or purpose one of its incidents. Control of the state educational institutions is the subject to which the proposed amendment relates. Its purpose or object is to place such institutions under the control of a single board. The membership of such board, its powers, and the abolition of the local boards, are but incidental to and necessarily connected with the object intended. Hence we conclude that only one amendment was submitted." 10 S.D. at 121, 72 N.W. at 97.

In essence, we held in State ex rel. Adams v. Herried, supra, that the single object of the amendment was to "place such institutions under the control of a single board," and that the various changes made were incident thereto. In the amendment now before us, the changes submitted are just as "incidental to and necessarily connected with the object intended."

We find further precedent to the same effect from many states, including our neighboring states, Minnesota and Idaho. In Fugina v. Donovan, 1960, 259 Minn. 35, 104 N.W.2d 911, the Minnesota Supreme Court held valid a constitutional amendment which (1) permitted the legislature to extend the term of any session for not more than thirty days, (2) allowed legislators to serve as notaries, and (3) permitted legislators to seek election to other offices. The court held that a provision identical to our former Article XXIII, § 1, was not violated, stating that: "propositions that might be submitted separately may be submitted in a single proposal if they are rationally related to a single purpose, plan, or subject." The court found that the basic

purpose of the amendment was to deal with the "burdens of being a legislator."

In Keenan v. Price, 1948, 68 Idaho 423, 195 P.2d 662, the Idaho Supreme Court held valid a constitutional amendment that (1) increased terms for constitutional officers, (2) altered residency requirements, and (3) provided that the governor could not immediately succeed himself. The court stated:

> " 'If, in the light of common sense, the propositions have to do with different subjects, if they are so essentially unrelated that their association is artificial, they are not one; but if. they may be logically viewed as parts or aspects of a single plan, then the constitutional requirement is met in their submission as one amendment.'

> \* \* \* \* \* \*

> "The test for duplicity in a constitutional amendment, when viewed in the light of cases on the subject, is not that the matters contained therein might be divided and submitted in separate questions, but that they are incongruous and essentially unrelated." 195 P.2d at 678 and 681.

■ In considering the validity of this amendment we must keep in mind these basic principles. When considering a constitutional amendment after its *adoption by the people,* the question is not whether it is possible to *condemn* the amendment, but whether it is possible to *uphold* it. State v. Cooney, 1924, 70 Mont. 355, 225 P. 1007. It should be sustained unless it "plainly and palpably appear[s] to be invalid." State ex rel. Adams v. Herried, supra.

We conclude that the matters contained in the challenged amendment rationally relate to the overall plan of making the executive branch of state government more efficient and responsible. The strong presumption of constitutionality after adoption by the people, the interpretation of the separate amendment provision of our constitution by this court in Adams, and the interpretations of like provisions in our sister states convince us that we need not strike down the amendment to Article IV as invalid under § 1 of Article XXIII (1889).

The lower court also held that the attorney general's explanatory statement on the 1972 ballot was deficient and actively misleading as to the position of superintendent of public instruction which was being eliminated as a constitutional office. SDCL 12-13-9 states:

> "It shall also be the duty of the attorney general, within sufficient time before the election for transmission to each county auditor of this state, to prepare a concise statement not to exceed four hundred words of the purpose and legal effect of each proposed constitutional amendment, * * * particularly with reference to the existing law, which statement shall follow immediately after the title on the official ballot * * *."

SDCL 12-13-12 states:

> "In precincts in which voting machines are used, the explanatory statement * * * shall not exceed one hundred words * * *."

The explanatory statement of the attorney general, set out in full above, mentioned a four-year term for the governor and other constitutional officers but did not specifically mention that the constitutional office of superintendent of public instruction was being eliminated.

■ The explanatory statement submitted was the same on both ballot and voting machine. We find it significant that the legislature felt that the purpose of the explanatory statement could be served through the use of one hundred words or less, as the legislature certainly could not have intended to deprive voting machine electors of fair notice. Thus we face the question of what the legislature did intend to provide by an explanatory statement, consisting of less than one hundred words.

Basic to the inquiry is the logical assertion that if the legislature had intended for all propositions to be noted on the ballot it would have required the amendment itself to appear on the ballot. We find it significant that the legislature did not so provide. Rather, the language, "purpose and legal effect," leads

to the conclusion that the proposed amendment was to be identified to the electorate in easily understood language enabling the voters to distinguish this amendment from the other four propositions on the ballots in 1972.

We reject the argument that an explanatory statement must educate the electorate on the proposed amendment. The Supreme Court of Texas in Hill v. Evans, 1967, Tex. Civ.App., 414 S.W.2d 684, held a constitutional amendment valid even though the ballot statement did not inform the voters that the amendment required annual voter registration. The court stated that:

> " 'It must be presumed * * * that the voter would familiarize himself with the contents of the proposed amendment before entering the ballot box, otherwise the legislature would have required a full copy on the ballot.'
>
>   *   *   *   *   *   *
>
> "If it is presumed that when the voter reaches the polling place he is already familiar with the contents of the proposed amendment, the language of the ballot will have served its purpose if it directs his attention to the amendment in such manner that he can identify the amendment and not confuse it with other propositions on the same ballot. To accomplish this end, the ballot language need show only the character and purpose of the amendment, and need not show all details. When the ballot has directed the attention of the voter to an amendment with which he is presumed to be familiar, the ballot has given fair notice, and the results of the election will not be set aside by reason of insufficiency of the ballot.
>
> "In view of the publicity, both official and otherwise, over a period of at least three months immediately prior to the election, through newspapers, radios, and television, and the widespread interest of the public in the subject, it would appear highly unlikely that any voter within the sight or sound of these media, or of other voters, went to the polls November 8 without knowing the scope and character of Proposition No. 7." 414 S.W.2d of 692 and 693.

■ Our own court in Lovett v. Ferguson, 1897, 10 S.D. 44, 71 N.W. 765, stated:

> "The form of the submission could not have misled the voters, as they must have fully understood the questions submitted. It is a matter of common knowledge that, during the 18 months preceding the election, the question of this amendment was the subject of general discussion by the press, in the churches, and upon the platform, and there could have been but very few persons, if any, who did not fully comprehend the nature of the amendment and the effect of a yes or no vote." 10 S.D. at 55, 71 N.W. at 768.

We agree that the basic purpose of a ballot statement is to identify an amendment to an informed electorate rather than to educate it. In fact, by SDCL 12-18-15, the time a voter can be in the voting booth is limited to five minutes. As in Hill v. Evans and Lovett v. Ferguson, supra, the proposed amendment here received widespread publicity in all of the news media, and was the subject of intense public and private discussion preceding its submission. We hold that neither the reference to "other constitutional officers" nor the omission of the fact of abolition of respondent's office requires a finding that the explanatory statement was affirmatively misleading.

The amendment to Article IV was properly submitted to the electorate under § 1 of Article XXIII as it then existed. The explanatory statement required by SDCL 12-13-9 was a part of that process of submission.

We conclude that the challenged ballot statement satisfies both the constitutional requirement of fair notice and the statute that created it.

The judgment of the circuit court is reversed and the peremptory writ of mandamus is quashed.

PARKER, Circuit Judge, sitting for WOLLMAN, Justice, disqualified.