2004 SD 102

**Jason SCHULTE, Applicant and Appellee,**

v.

**Larry LONG, South Dakota Attorney General, and Chris Nelson, Secretary of State, Respondents and Appellants.**

No. 23371.

Supreme Court of South Dakota.

Considered on Briefs Sept. 2, 2004.

Decided Sept. 3, 2004.

Ron J. Volesky of Volesky Law Firm, Huron, South Dakota, Attorney for applicant and appellee.

Lawrence E. Long, Attorney General, Jeffrey P. Hallem, Assistant Attorney General, Pierre, South Dakota, Attorneys for respondents and appellants.

GILBERTSON, Chief Justice.

[¶ 1.] The issue on appeal is whether the Attorney General exceeded his statutory authority by including a statement in the ballot explanation for 2004 Initiated Measure 1 that, if adopted, the measure would exempt food from state and municipal sales and use taxes "and eliminate this source of revenue." The circuit court held that the phrase "and eliminate this source of revenue" in the Attorney General's explanation is a negative editorial statement outside the statutory authority granted to him under SDCL 12–13–9. We disagree, however, and conclude that the statement falls within authority granted to the Attorney General by SDCL 12–13–9. Consequently we reverse the judgment and order issuing writ of certiorari.

FACTS

[¶ 2.] On May 4, 2004 Jason Schulte, the current executive director of the South Dakota Democratic Party, filed an initiative petition in the Secretary of State's office. The language in the initiated measure was proposed by Schulte. According to the petition, the voters of the State of South Dakota are being asked to approve or reject "An act to exempt food from sales and use taxes." It proposes to amend SDCL ch. 10–45 (Retail Sales and Service Tax) and SDCL ch. 10–46 (Use Tax) by adding sections providing "There are exempted from the provisions of this chapter and the computation of the tax imposed by it, the gross receipts from the sale of food." The proposed law also de-

fines what is and is not food. The law proposed in the petition is now designated "Initiated Measure 1." [1]

[¶ 3.] On July 26, 2004, pursuant to SDCL 12–13–9, the Attorney General delivered an explanation of Initiated Measure 1 to the Secretary of State. It provided:

ATTORNEY GENERAL

2004 BALLOT EXPLANATION

INITIATED MEASURE 1

*Title:* An act to exempt food from sales and use taxes.

*Explanation:*

The state collects a sales and use tax on the sale of food. Many cities and towns also collect a municipal sales and use tax on the sale of food.

Initiated Measure 1, if adopted, would exempt food from state and municipal sales and use taxes, and eliminate this source of revenue.

A vote "Yes" will change state law.

A vote "No" will leave state law as it is.

The Secretary of State delivered a certified true and correct copy of Initiated Measure 1 as well as the statement, title, explanation and recitation required by SDCL 12–13–9 to each county auditor on August 9, 2004. SDCL 12–13–1.

[¶ 4.] Schulte, the original sponsor of Initiated Measure 1, applied to the circuit court for a writ of certiorari. He objected to the phrase "and eliminate this source of revenue" in the ballot explanation. He contended that by including this language in the ballot explanation the Attorney General exceeded the authority granted by SDCL 12–13–9.

[¶ 5.] The circuit court entered an order granting the writ of certiorari. It ordered the Attorney General and Secretary of State to direct the county auditors not to print the ballots for the November 2, 2004 election until the issue was resolved.

[¶ 6.] The circuit court heard the matter on August 25, 2004, entered a memorandum decision on August 26, 2004, and filed its judgment and order issuing writ of certiorari on August 27, 2004.

[¶ 7.] The circuit court concluded that the contested language in the explanation constituted a negative editorial statement. The court explained:

The explanation implies that a "yes" vote will strangle state and municipal budgets. It also speculates that the legislature will not replace the revenue affected by the ballot measure. The implication is editorial and negative and the speculation is unwarranted and improper.

The attorney general's addition of the practical effect of the initiated measure to the legal effect only states one of the many practical effects. There are many other possible detrimental and beneficial effects. Some are obvious and others are conjectural. Listing one practical effect to the exclusion of others is editorial.

In the recent past, the attorney general has remained out of the political fray in explaining ballot measures with revenue consequences. The attorney general's explanation of the proposed repeal of the video lottery read: "The Constitution authorizes legislative enactment of video lottery. Amendment D removes that authority and will repeal all video lottery laws." There was no mention that repeal of the video lottery would eliminate

1. The full text of Initiated Measure 1 is appended.

that source of revenue. The attorney general's explanation of the proposed repeal of the state inheritance tax read: "The State currently imposes inheritance taxes. Amendment C would repeal the state tax on any inheritance on the property of anyone who dies on or after July 1, 2001, and would prohibit the Legislature from enacting a tax on any inheritance." There was no mention that repeal of the inheritance tax would eliminate that source of revenue. The present appearance of the "eliminate this source of revenue" language in the attorney general's explanation of Initiated Measure 1 means either the attorney general did not adequately explain the legal effect of the video lottery and inheritance tax ballot measures or it is an editorial comment unrelated to the legal effect of the initiative.

An example illustrates the editorial nature of the remainder of the statement. Governor Rounds has stated publicly that repeal of the sales tax on food will cut taxes by $42,000,000 to the state and $18,000,000 to municipalities (total tax savings of $60,000,000). According to the U.S. Census Bureau, the 2003 estimated population of South Dakota is 764,844. Therefore, adoption of the initiative would save each South Dakotan $78.45 in taxes. Saving taxes is no more a legal effect of passage of the initiative than eliminating revenue. Yet if the attorney general's explanation said "lower taxes" instead of "eliminate revenue," the explanation would cast a more favorable light on the initiated measure. Both explanations are true. Both are matters of fact and not legal effect. Both are editorial and improper.

The legal effect of the initiated measure which is to "exempt food from state and municipal sales and use taxes" is correctly stated. The negative editorial statement about eliminating revenue is outside the statutory authority granted to the attorney general under SDCL 12–13–9. (footnotes omitted).

[¶ 8.] It ordered the Attorney General to provide a revised explanation to the Secretary of State which omitted the language "and eliminate this source of revenue." It ordered the Secretary of State to provide the revised explanation to the county auditors.

[¶ 9.] The Attorney General and Secretary of State filed a notice of appeal on August 27, 2004. Because county auditors must have official ballots printed by September 21, 2004 when absentee voting begins, the Attorney General and Secretary of State asked this Court to resolve the issue no later than September 7, 2004 so there would be a reasonable time to print ballots. The briefing schedule was expedited. After full consideration we announce our decision today, September 3, 2004.

ANALYSIS AND DECISION [2]

[¶ 10.] The full text of initiated measure is not printed on the election ballot. Instead SDCL 12–13–11 requires:

The title, explanation, recitation, place for voting, and statement as required by this chapter shall be printed on the ballot in lieu of the law, measure, constitu-

---

**2.** The Attorney General also jurisdictionally challenges the right of the circuit court to enter relief in this matter in the form of a writ of certiorari. Under SDCL 21–31–1 a writ of certiorari may be granted by a circuit court when an officer exceeds his or her jurisdiction. Thus in this case, the writ is appropri-ate to determine whether or not the Attorney General properly complied with his legal duties under SDCL 12–13–9. Moreover, certiorari was found to be a proper method of addressing the scope of SDCL 12–13–9 in *Hoogestraat*.

tional amendment, or other question to be submitted to a vote of the people. All proposed constitutional amendments to be submitted at an election shall be placed on one ballot and all initiated measures or referred laws upon a separate ballot.

Pursuant to SDCL 12–13–9 "the attorney general shall deliver to the secretary of state the statement, the title, the explanation, and a clear and simple recitation of the effect of a 'Yes' or 'No' vote." SDCL 12–13–9 further provides:

*The explanation shall state succinctly the purpose and legal effect of the proposed amendment to the Constitution, the initiated measure, or the referred law.* The explanation shall be a clear and simple summary of the issue and may not exceed two hundred words in length. On the printed ballots, the title shall be followed by the explanation and the explanation shall be followed by the recitation.

[¶ 11.] In deciding the matter before us, we cannot take a side in the debate on the merits of the ballot issue. We also cannot allow that debate to enter the voting booth on the face of the ballot. Our prior cases have examined this statute as to what it requires and what it does not allow. The explanation must be factually accurate, legally accurate, concise, must not address collateral, theoretical or potential consequences of approval or disapproval by the voters, must not be a statement of personal opinion and must not attempt to advocate for or against the ballot question. *See generally Hoogestraat v. Barnett,* 1998 SD 104, 583 N.W.2d 421. However within this legal framework, the Attorney General is granted discretion as to how to author the ballot statement. *Gormley v. Lan,* 88 N.J. 26, 438 A.2d 519, 525 (1981). Moreover this Court's function is a limited one. We merely determine if the Attorney General has complied with his statutory obligations and we do not sit as some type of literary editorial board.

[¶ 12.] In *Hoogestraat* this Court considered whether a ballot explanation satisfied the requirements of SDCL 12–13–9. We noted that:

This Court has, however, considered whether a ballot statement satisfied the requirements of SDCL 12–13–9 which, at that time, required the Attorney General to prepare a "concise" statement of "the purpose and legal effect of each proposed constitutional amendment ... particularly with reference to existing law." *Barnhart v. Herseth,* 88 S.D. 503, 513, 222 N.W.2d 131, 136 (1974).

The *Barnhart* court noted that the language "purpose and legal effect" led to the conclusion that a ballot explanation of a proposed constitutional amendment "was to be identified to the electorate in easily understood language enabling the voters to distinguish this amendment from the other ... propositions on the ballot[.]" *Barnhart,* 88 S.D. at 514, 222 N.W.2d at 137. The court rejected the argument that a ballot explanation must educate the electorate since voters are presumed familiar with proposed amendments through the publicity given the amendments in the time leading up to the election. *Id.* "[T]he basic purpose of a ballot statement is to identify an amendment to an informed electorate rather than to educate it." *Id.,* 88 S.D. at 515, 222 N.W.2d at 137.

Consequently the focus of a ballot explanation is restricted. It must clearly, simply, and succinctly identify and summarize the purpose and legal effect of a proposed amendment to an already educated and informed voter who has ten minutes in which to vote. SDCL 12–13–9; SDCL 12–18–15; *Barnhart,* 88 S.D.

at 514, 222 N.W.2d at 137. The legal effect that must be succinctly stated refers to the result that the proposed constitutional amendment will have upon existing law. *See* Black's Law Dictionary 514 (6th ed 1990). It does not refer to collateral, theoretical or potential consequences which may or may not occur.

*Hoogestraat,* 1998 SD 104, ¶ 10–12, 583 N.W.2d 421, 424.

[¶ 13.] In *Hoogestraat* we concluded that the explanation that Proposed Constitutional Amendment E "could result in successful lawsuits against the State of South Dakota, under the U.S. Constitution" went beyond the authority granted by SDCL 12–13–9. We said that the explanation

clearly exceeds the purpose of a ballot explanation. It is not a statement of how Proposed Constitutional Amendment E would change existing law. Rather, it is conjecture as to possible consequences of a change in existing law. As such, it has no place in a ballot explanation appearing on the general election ballot. It is purely a statement of opinion which is not appropriate to the political campaign and education process leading up to the election. (footnote omitted).

*Hoogestraat,* 1998 SD 104, ¶ 13, 583 N.W.2d 421, 424.

[¶ 14.] In this case the ballot explanation provides that "Initiated Measure 1, if adopted, would exempt food from state and municipal sales and use taxes, and eliminate this source of revenue." The circuit court considered the phrase "eliminates this source of revenue" to be factual, but held that it created negative implications and speculations and ignored "other possible" effects, whether beneficial or detrimental.

[¶ 15.] We initially observe that the proponents of Initiated Measure 1 drafted the title of the measure, "An act to exempt food from sales and use taxes." The proponents also controlled the purpose of the measure, "There are exempted from the provisions of this chapter and the computation of the tax imposed by it, the gross receipts from the sale of food." The Attorney General's ballot explanation uses both when it titles Initiated Measure 1 "An act to exempt food from sales and use taxes" and explains, in part, "Initiated Measure 1, if adopted would exempt food from state and municipal sales and use taxes[.]"

[¶ 16.] The explanation goes on to state that Initiated Measure 1, if adopted, would "eliminate this source of revenue." *Hoogestraat* warned that conjecture as to possible collateral, theoretical or potential consequences of a change in existing law had no place in a ballot explanation. 1998 SD 104 at ¶ 12–13, 583 N.W.2d 421, 424. The explanation of Initiated Measure 1, however, provides none of this. Rather, it is a narrowly crafted statement of "the purpose and legal effect", SDCL 12–13–9, of Initiated Measure 1.[3] The purpose of

---

**3.** While SDCL 12–13–9 does not allow the Attorney General to render a full-blown legal opinion on the face of the ballot, it does allow an explanation of the "legal effect" of the proposal. *Hoogestraat.*

Clearly the language "legal effect" cannot be read out of the statute. The question then becomes what is meant by the statutory language "legal effect." The word "effect" is defined as "[t]hat which is produced by an agent or cause; result; outcome; consequence." Black's Law Dictionary 514 (6th ed 1990). "Legal" is defined as "of or pertaining to the law." *Id.* at 892. Thus, the plain meaning of "legal effect" includes consequences of or pertaining to the law. (footnote omitted). *Hoogestraat,* 1998 SD 104 at ¶ 27, 583 N.W.2d at 426 (Amundson, J., dissenting).

Initiated Measure 1, as the proponents petition clearly provided, is to "exempt food from state and municipal sales and use taxes." The legal effect of exempting food from sales and use taxes is to eliminate revenue formerly generated from the taxation of food. Thus the use of the phrase "eliminate this source of revenue" uses plain, neutral language to accurately explain the direct legal effect of the action proposed by the initiative.[4] Schulte now finds fault with the Attorney General's failure to state that not all food will be subject to the sales tax repeal and thus his phrase "eliminate this source of revenue" is inaccurate and overstates the potential loss in revenue to the State and its subdivisions. However Schulte is bound by the title to the act which he, and not the Attorney General authored, "An act to exempt food from sales and use taxes" without any reference to potential exemptions.

[¶ 17.] The circuit court erred by concluding that the disputed phrase "and eliminate this source of revenue" was the equivalent of "revenue would be eliminated." The court either overlooked the word "source" in the disputed phrase or read "source" out of the explanation.

[¶ 18.] Much of the argument and a substantial portion of the circuit court's analysis in this case focus on what is implied or suggested by the Attorney General's language. We cannot here be concerned with implication or suggestion. What is implied or suggested by the lan-

guage used will obviously lie in the eye of the beholder and will necessarily vary from reader to reader and voter to voter. In statutory analysis, we would state that we cannot be concerned with what the legislature should have said or might have said, but what it did say. *See e.g. State v. Galati,* 365 N.W.2d 575, 578 (S.D.1985). Much the same is true here. We cannot be concerned with what the Attorney General should have said or could have said or might have said or what is implied or suggested by what he did say. Rather we must focus on the language chosen and whether it is an accurate statement of how the proposed initiative changes existing law.

[¶ 19.] In addition the circuit court observed that the absence of the "eliminate this source of revenue language" in the Attorney General's ballot explanation of the 2000 proposed repeal of video lottery and the 2000 proposed repeal of the inheritance tax means "either the attorney general did not adequately explain the legal effect of the video lottery and inheritance tax measure or it is an editorial comment unrelated to the legal effect of the initiative."

[¶ 20.] The Attorney General attempted to use prior ballot explanations as precedent for the disputed language in Constitutional Amendment E. Because these explanations were never challenged we expressed no opinion on whether the

---

"Purpose" is defined as "That which one sets before him to obtain or accomplish or obtain ... the term is synonymous with the ends sought, an object to be obtained...." Black's Law Dictionary 862 (5th ed Abridged 1991).
The purpose of taxation is the raising of revenue for governmental purposes. *Brink v. Dann,* 33 S.D. 81, 103, 144 N.W. 734, 737 (1913). The legal effect of exempting food from sales and use taxes is eliminating this source of revenue.

4.  Under the circuit court's analysis the Attorney General would be deprived of his discretion as to how to author the ballot explanation, *see* ¶ 11, and would be relegated to merely regurgitating the language in the title of the proposed initiative. This would render SDCL 12–13–9's requirement of explaining the purpose and legal effect of a measure a nullity.

language in the prior ballot explanations was proper under SDCL 12–13–9. *Hoogestraat*, 1998 SD 104 at ¶ 13, fn. 4, 583 N.W.2d 421, 424 at fn. 4. For the same reason we express no opinion on the video lottery and inheritance tax explanations. We simply observe that the use of different language in a ballot explanation does not render that language beyond the authority of SDCL 12–13–9 as long as the explanation represents an accurate statement of how the proposed initiative changes existing law.

[¶ 21.] The judgment and order issuing writ of certiorari is reversed.

[¶ 22.] MEIERHENRY, Justice, concurs.

[¶ 23.] ZINTER, Justice, concurs with writing.

[¶ 24.] SABERS and KONENKAMP, Justices, dissent.

ZINTER, Justice (concurring).

[¶ 25.] I fully join the Court's opinion and write only to emphasize three points.

[¶ 26.] First, we must remember that our scope and standard of review is limited. This Court's scope of review in certiorari is limited to examining the Attorney General's jurisdiction and authority. SDCL 21–31–1; *In the Matter of the Wrongful Payments made by the Brookings School District*, 2003 SD 101, ¶ 16, 668 N.W.2d 538, 544–545. Furthermore, our standard of review on those issues allows the Attorney General "significant discretion" in carrying out his statutory duty of drafting ballot explanations. *Hoogestraat v. Barnett*, 1998 SD 104, ¶ 21, 583 N.W.2d 421, 425 (Gilbertson, J., concurring). The two principal reasons for such deference were set forth in *Gormley v. Lan*, 88 N.J. 26, 38–39, 438 A.2d 519, 525–

526. Our case warrants repeating *Lan's* extensive discussion of those reasons.

In evaluating the statement drafted by the Attorney General ... we should accord great deference to [the Attorney General's] determination not only on the basis of settled principles of law, but also because of the glaring inappropriateness of judicial management and supervision of such matters. When within the scope of legislatively-delegated authority, administrative agents' actions are presumptively valid, and where that authority confers discretion upon those agents, their actions will ordinarily not be overturned by the courts unless they are manifestly corrupt, arbitrary or misleading. We can conceive of few cases where administrative officials' discretion is of necessity broader than here, given the enormous variety of statements that could properly be drafted within the authority vested in those officials. This being the case, the deference accorded the ... Attorney General must obviously be even greater than is generally the case. Finally, we have traditionally shown special deference to administrative agents charged with implementing the election laws. The other basis for yielding to the judgment of the administrative officers here is the inappropriateness of judicial involvement. Public questions often have substantial political overtones. As here, the drafting of an interpretive statement, as well as the question itself, can pit party against party, the Executive against the Legislature, and region against region. The appearance of impartiality is as important to judicial effectiveness and legitimacy as impartiality itself, and in these matters it will often be impossible to appear impartial. Rare is the case where the inadequacy of the interpretive statement will justify the risk of judicial intervention. That risk inheres not simply in the proposal of an alternative[,] but as well in the mere enjoining of the

use of the proposed statement. Either can readily be perceived by one side or the other as both prejudicial to their cause and partial to that of their adversary.

*Id.* (internal citations omitted).

[¶ 27.] Although this deferential standard of review is no shield to retreat from our constitutional duty in the appropriate case, the rhetoric in this case proves the wisdom of *Lan's* reasoning. Thus, settled law on the Attorney General's discretion and the inappropriateness of judicial management of ballot explanations both require that we decline Applicant's invitation to become the ultimate scrivener of this ballot explanation.

[¶ 28.] I also write to point out that Applicant's position is fatally inconsistent. It should not go unnoticed that this explanation is only three sentences long, and Applicant raises no objection to the first two sentences that frame the issue by indicating that the state, as well as many cities and towns, "*collect* a sales and use tax on the sale of food." Applicant only objects to part of the last sentence explaining that passage of the measure would eliminate *this source* of revenue. However, it is incongruent to suggest that it is unlawful to explain one, but not both of the related matters at issue. Stated rhetorically, how can it be lawful to explain that a tax *is collected*, but unlawful to explain that passage of a new law will eliminate *that* source of revenue?

[¶ 29.] Finally, from my perspective, it defies logic and common sense to conclude that the "elimination of this source of revenue" is not a "result that the proposed [ ] amendment will have upon existing law." It is equally nonsensical to conclude that

the explanation is not a "recitation of the [purpose and legal] effect of a 'Yes' or 'No' vote." *See, Hoogestraat v. Barnett*, 1998 SD 104, ¶ 8, ¶ 12, 583 N.W.2d at 423–424. The circuit court's contrary conclusions are based upon a perceived distinction between the initiated measure's legal effect and its practical effect. However, that is a distinction without a difference. The legal *and* practical effect of this measure is to repeal a tax *and* remove that source of revenue from the government's coffers. Only a hyper-technical parsing of words could suggest that the measure does not legally affect sales and use tax law.[5] Furthermore, the circuit court's prohibition on any reference to the word "revenue" fails to consider the remaining statutory provisions that give the Attorney General authority to explain the "purpose" of the initiated measure, including an explanation "of the issue." SDCL 12–13–9. "Revenue" is certainly a purpose of this measure, and it is unquestionably part of the issue.

[¶ 30.] A common sense reading of the Attorney General's language reflects that it does no more than explain the issue, as well as the purpose and legal effect that the initiated measure will have on existing tax law. Therefore, when all provisions of SDCL 12–13–9 are considered, the Attorney General did not exceed his statutory authority.

SABERS, Justice (dissenting).

[¶ 31.] The last time this Court addressed an Attorney General's ballot explanation, the author of the majority opinion recognized the tremendous responsibility of this Court and stated: "At stake here is the impartiality and integri-

---

5. There is also *nothing* in the *text* of this explanation justifying the circuit court's conclusions that the explanation (1) implies that a yes vote "will strangle state and municipal budgets," and, (2) "speculates that the Legislature will not replace the revenue." Had there been such language (or implication), this would be a different case.

ty of the voting booth." *Hoogestraat v. Barnett*, 1998 SD 104, ¶ 18, 583 N.W.2d 421, 425 (Gilbertson, J., concurring). Indeed, there are few other things as cherished or as necessary for our government as the act of voting. To aid in this awesome responsibility "[t]he Legislature has seen fit to assist the people in voting on proposed constitutional amendments created by initiative by authorizing the Attorney General to give a brief explanation per SDCL 12–13–9." *Id.* When an Attorney General's ballot explanation, which is printed directly on the ballot and is the last thing a voter sees before casting a vote, loses objectivity, it is objectionable. In this regard, our obligation is no less than that of the Attorney General, to take no sides in the debate on the proposed amendment but, instead, act impartially to ensure a voter is presented with a fair, accurate and concise explanation of the proposed measure. Because the majority opinion allows the Attorney General to breach this requirement, I dissent.

[¶ 32.] I agree with the majority opinion that the analytical framework for reviewing a disputed portion of an Attorney General's ballot explanation was clearly set forth in *Hoogestraat*, 1998 SD 104, 583 N.W.2d at 421. We recognized that the significance of the ballot explanation is derived from the fact that "[t]he full text of a proposed amendment to the constitution is not printed on the election ballot in South Dakota." *Id.* ¶ 8 (citing SDCL 12–13–11). Rather, the Attorney General is required to prepare an explanation of the proposed amendment by submitting "the statement, the title, the explanation, and a clear and simple recitation of the effect of a 'Yes' or 'No' vote." SDCL 12–13–9. "The explanation *shall state succinctly the purpose and legal effect* of the proposed amendment to the Constitution, initiated measure, or the referred law." *Id.* (emphasis added). This explanation "shall be a clear

and simple summary of the issue and may not exceed two hundred words in length." *Id.*

[¶ 33.] The purpose of the Attorney General's explanation "is to identify an amendment to an informed electorate rather than to educate it." *Hoogestraat*, 1998 SD 104, ¶ 11, 583 N.W.2d at 424 (quoting *Barnhart v. Herseth*, 88 S.D. 503, 515, 222 N.W.2d 131, 137 (1974)). "[V]oters are presumed familiar with proposed amendments through the publicity given the amendments in the time leading up to the election." *Id.* As a result, the ballot explanation is restricted. The scope of the ballot explanation is only to "clearly, simply, and succinctly identify and summarize the purpose and legal effect of a proposed amendment to an already educated and informed voter." *Id.* ¶ 12.

[¶ 34.] In paragraph 11, the majority opinion provides:

> In deciding the matter before us, we cannot take a side in the debate on the merits of the ballot issue. We also cannot allow that debate to enter the voting booth on the face of the ballot. Our prior cases have examined this statute as to what it requires and what it does not allow. The explanation must 1) be factually accurate, 2) legally accurate, 3) concise, 4) must not address collateral, 5) theoretical or 6) potential consequences of approval or disapproval by the voters, 7) must not be a statement of personal opinion and 8) must not attempt to advocate for or against the ballot question.

(numbers added) (citing *Hoogestraat*, 1998 SD 104, 583 N.W.2d at 421). The addition of the offending language "and eliminate this source of revenue" makes the explanation:

(1) less factually accurate;

(2) less legally accurate;

(3) less concise;

(4) address collateral consequences;

(5) address theoretical consequences;

(6) address potential consequences;

(7) a possible statement of personal opinion; and,

(8) advocates against the ballot question.

In other words, it fails on all of the eight factors.

[¶ 35.] I disagree completely with the majority opinion on *its* application of the law of *Hoogestraat* to these facts. It impermissibly allows the Attorney General to go beyond the "basic purpose" of the ballot explanation which is to "identify an amendment to an informed electorate rather than to educate it." *Hoogestraat*, 1998 SD 104, ¶ 11, 583 N.W.2d at 424. In this regard, the reasoning of the majority opinion relies heavily upon the rationale of the lone dissenter in that case to approve the disputed language as "legal effect." *See Hoogestraat*, 1998 SD 104, ¶ 27, 583 N.W.2d at 426 (Amundson, J., dissenting). This is particularly perplexing considering that is a position which the author of the majority opinion did not join and rejected.

[¶ 36.] In this case, the Attorney General and Secretary of State contend that the phrase "eliminate a source of revenue" explains the direct legal effect of the proposed initiative. However, we have recognized that "the direct legal effect that must be succinctly stated refers to the result that the proposed constitutional amend-

ment will have upon existing law." *Id.* ¶ 12. Rather than remarking on how the proposed repeal of the food tax would effect existing law, the Attorney General's explanation directed attention to the financial or "pocketbook" effect the proposal would have if adopted by the voters of the State. This is impermissible under the statutory framework.

[¶ 37.] In comparison, other states have statutorily authorized fiscal impact to be provided to the voters in a ballot summary when considering a proposed amendment. *See Proposed Initiated Constitutional Amendment Concerning Unsafe Workplace Environment*, 830 P.2d 1031, 1035 (Colo.1992).[6] However, as we recognized in *Hoogestraat*, South Dakota's statutory system is unique. *Hoogestraat*, 1998 SD 104, ¶ 9, 583 N.W.2d at 424. The Attorney General is limited to solely explaining the purpose and legal effect of the proposal with a clear and simple recitation. SDCL 12-13-9. By including matters outside the scope of the "purpose and legal effect" of the proposed amendment, the Attorney General's explanation was unwarranted and statutorily prohibited. We are not to concern ourselves with the merit of this proposed amendment, that is the business of the electorate. Likewise, the Attorney General cannot interfere with the business of the electorate by intentionally or unintentionally bending to partisan sides in his ballot explanation.[7]

[¶ 38.] Even if one were to accept the majority opinion's determination that the

---

6. Even with the inclusion of such financial information the explanation "must be clear, concise, true and impartial, and must not consist of argument, nor be such as to likely create prejudice, either for or against the measure." *Title, Ballot Title and Submission Clause Approved September 4, 1991*, 826 P.2d 1241, 1244 (Colo.1992). Likewise, South Dakota's voters deserve nothing less.

7. For instance, the Governor's official statement against the initiated measure filed with the Secretary of State and contained in the record focuses almost exclusively on the loss of revenue and the "funding crisis" should the measure be approved. It is certainly the prerogative of the Governor to take a stand on this issue. However, it is not the Attorney General's job to reinforce any political view by the wording of the ballot explanation.

reference to the effect on revenue is somehow permissible, factually, the disputed portion of the ballot is incorrect in that it indicates that food tax, as a source of revenue, would be "eliminate[d]." However, the initiated measure exempts certain foods from the effect of the proposed measure, making them taxable. For example, "the term, food, does not include alcoholic beverages, tobacco, soft drinks, candy or prepared foods." In other words, the word "eliminate" is inaccurate and the word "modify" would be accurate. In that regard, the Attorney General's statement is inaccurate and misleading.

[¶ 39.] Nevertheless, the majority opinion faults the drafters of the measure for not specifying more in their *title* concerning the exemptions. While the authors of the proposed measure drafted the title, it must be remembered that this was a title, part and parcel of the entire measure, which included the definition of "food." The majority opinion removes the title from its context, faults the drafters for not defining words in the title, and then shifts the burden of providing an adequate explanation from the Attorney General, the party statutorily required to accurately and fairly explain the measure, to the drafters. It is not the fault of the drafters that the Attorney General did not explain the term "food" in the factual and legal sense it was used within this context. Yet, this is something that would more logically have been within the Attorney General's mandate to explain the "legal effect" of the proposed measure. Apparently, this was secondary to the impact on revenue.

[¶ 40.] The circuit court properly recognized that the Attorney General's ballot explanation crossed the line from explanation to advocacy. Even if the Attorney General's statement were accurate, "it [would be] the accuracy of an advocate." *Gormley v. Lan,* 88 N.J. 26, 438 A.2d 519,

526 (N.J.1981). Only with the omission of the offensive provision will the ballot explanation become concise and narrowly crafted as is required by SDCL 12–13–9, or accurate.

[¶ 41.] I dissent for all of these reasons.

A postscript to Attorney General Larry Long:

[¶ 42.] In *Hoogestraat* at paragraph 18, Justice Gilbertson said: "At stake here is the impartiality and integrity of the voting booth." *Hoogestraat,* 1998 SD 104, ¶ 18, 583 N.W.2d at 425. Although he has apparently changed his mind, it is not too late for you to do the right thing.

[¶ 43.] You have won an advantage for your party, a political advantage. But you are the Attorney General for all the people of the State of South Dakota-your job is to fully and faithfully perform the duties of the chief law enforcement officer in the State of South Dakota for all of the people.

[¶ 44.] I encourage you to remove the offending language from the ballot and the voting booth. Do the right thing for all the people of South Dakota.

[¶ 45.] KONENKAMP, Justice, joins this dissent, except for the postscript.

## APPENDIX

### INITIATED MEASURE

The following initiated measure was proposed by petition for submission to the voters. This initiated measure will not become effective unless approved by majority vote.

### Initiated Measure I

*Title:* An act to exempt food from sales and use taxes.

*Full Text of Initiated Measure I:*

WE, THE UNDERSIGNED qualified voters of the state of South Dakota, petition that the following proposed law be submitted to the voters of the state of South Dakota at the general election on November 2, 2004 for their approval or rejection pursuant to the Constitution of the State of South Dakota. The substance of the proposed law is as follows:

Be it enacted by the people of South Dakota.

An act to exempt food from
sales and use taxes.

Section 1. That chapter 10–45 be amended by adding thereto a NEW SECTION to read as follows:

There are exempted from the provisions of this chapter and the computation of the tax imposed by it, the gross receipts from the sale of food.

Section 2. That § 10–45–1 be amended by adding thereto four NEW SUBDIVISIONS to read as follows:

"Food," and "food ingredient," any substance, whether in liquid, concentrated, solid, frozen, dried, or dehydrated form, that is sold for ingestion or chewing by humans and is consumed for its taste or nutritional value. The term, food, does not include alcoholic beverages, tobacco, soft drinks, candy, or prepared food;

"Soft drinks," any nonalcoholic beverages that contain natural or artificial sweeteners. The term, soft drinks, does not include any beverage that contains milk or milk products, soy, rice or similar milk substitutes, or greater than fifty percent of vegetable or fruit juice by volume;

"Candy," any preparation of sugar, honey, or other natural or artificial sweeteners in combination with chocolate, fruits, nuts or other ingredients or flavorings in the form of bars, drops, or pieces. The term,

candy, does not include any preparation containing flour and does not require refrigeration;

"Prepared food" any:

(a) Food sold in a heated state or heated by the seller;

(b) Two or more food ingredients mixed or combined by the seller for sale as a single item. The term, prepared food, in this subsection does not include food that is only cut, repackaged, or pasteurized by the seller, and eggs, fish, meat, poultry, and foods containing these raw animal foods requiring cooking by the consumer as recommended by the Food and Drug Administration in chapter 3, part 401.11 of its Food Code as of January 1, 2003, so as to prevent food borne illnesses; or

(c) Food sold with eating utensils provided by the seller, including plates, knives, forks, spoons, glasses, cups, napkins, or straws. A plate does not include a container or packaging used to transport the food.

Section 3. That chapter 10–46 be amended by adding thereto a NEW SECTION to read as follows:

There are exempted from the provisions of this chapter and the computation of the tax imposed by it, the gross receipts from the sale of food.

Section 4. That § 10–46–1 be amended by adding thereto four NEW SUBDIVISIONS to read as follows:

"Food," and "food ingredient," any substance, whether in liquid, concentrated, solid, frozen, dried, or dehydrated form, that is sold for ingestion or chewing by humans and is consumed for its taste or nutritional value. The term, food, does not include alcoholic beverages, tobacco, soft drinks, candy, or prepared food;

"Soft drinks," any nonalcoholic beverages that contain natural or artificial sweet-

eners. The term, soft drinks, does not include any beverage that contains milk or milk products, soy, rice or similar milk substitutes, or greater than fifty percent of vegetable or fruit juice by volume;

"Candy," any preparation of sugar, honey, or other natural or artificial sweeteners in combination with chocolate, fruits, nuts or other ingredients or flavorings in the form of bars, drops, or pieces. The term, candy, does not include any preparation containing flour and does not require refrigeration;

"Prepared food" any:

(a) Food sold in a heated state or heated by the seller;

(b) Two or more food ingredients mixed or combined by the seller for sale as a single item. The term, prepared food, in this subsection does not include food that is only cut, repackaged, or pasteurized by the seller, and eggs, fish, meat, poultry, and foods containing these raw animal foods requiring cooking by the consumer as recommended by the Food and Drug Administration in chapter 3, part 401.11 of its Food Code as of January 1, 2003, so as to prevent food borne illnesses; or

(c) Food sold with eating utensils provided by the seller, including plates, knives, forks, spoons, glasses, cups, napkins, or straws. A plate does not include a container or packaging used to transport the food.

The effective date of this repeal will be July 1, 2005.