#24139, 24162, GILBERTSON, Chief Justice
**2006 SD 71**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

#24139

DANIEL K. BRENDTRO,
Sponsor of an Initiated Measure,                    Petitioner,

v.

CHRIS NELSON, in his official capacity
as Secretary of State of South Dakota                    Respondent.

\* \* \* \*

#24162

CELLCO PARTNERSHIP D/B/A,
VERIZON WIRELESS, Sponsor
of an Initiated Measure,                    Petitioner,

v.

CHRIS NELSON, in his official capacity
as Secretary of the State of South Dakota,                    Respondent.

\* \* \* \*

ORIGINAL PROCEEDING

\* \* \* \*

ARGUED JULY 27, 2006

OPINION FILED **8/9/06**

PATRICK DUFFY of
Duffy & Duffy
Rapid City, South Dakota

MATTHEW T. TOBIN of
Tobin Law Office                        Attorneys for petitioner
Sioux Falls, South Dakota               Daniel K. Brendtro

JAMES E. McMAHON of
McMahon Law Office
Sioux Falls, South Dakota

MATTHEW S. McCAULLEY and
JONATHAN A. KOBES of                    Attorneys for petitioner
Murphy, Goldammer & Prendergast         Cellco Partnership d/b/a
Sioux Falls, South Dakota               Verizon Wireless.

LAWRENCE E. LONG
Attorney General

JEFFREY P. HALLEM
Assistant Attorney General
Pierre, South Dakota                    Attorneys for respondent.

#24139, 24162

GILBERTSON, Chief Justice

[¶1.]        Before the Court are two separate original proceedings in mandamus to compel the secretary of state to place initiated measures on the 2006 general election ballot.  One measure seeks to repeal the video lottery provisions of SDCL ch 42-7A.  The other seeks to repeal the four percent gross receipts tax on wireless telecommunications imposed by SDCL ch 10-33A.  For the reasons set forth below, the writs will issue.

FACTS

A.  Video Lottery

[¶2.]        The history of the video lottery law in South Dakota began in 1989 when the South Dakota Legislature authorized the South Dakota Lottery Commission to offer video lottery games.  1989 SDSessL ch 368.  The authorizing bill, Senate Bill 129, was signed into law on March 1, 1989.  *Id.*  It was amended that same session by Senate Bill 154 by adding three sections to the original bill.  One section approximated the generated revenues, one section included the amount in another house bill and the third section declared the revenues as:  "necessary for the support of state government and its existing public institutions pursuant to Article III, Section 1, of the Constitution of South Dakota."  1989 SDSessL ch 369.  This bill was signed on March 15, 1989.  The law was not referred to the voters nor was there any court action commenced to determine if the law fell within the referendum exceptions of article III, § 1.  *See generally*, Gravning v. Zellmer, 291 NW2d 751 (SD 1980).

[¶3.]        Initiated Measure 4  sought to repeal all the statutory provisions that the legislature had passed authorizing video lottery games.  1993 South Dakota

Legislative Manual at 632. Initiated Measure 4 was defeated in the general election on November 3, 1992. *Id*. at 629.

[¶4.]        Shortly after the unsuccessful initiated attempt to repeal video lottery, an action was filed in circuit court challenging the constitutionality of the original laws. The action sought to prohibit the State of South Dakota from operating video lottery and to require the immediate revocation of video lottery licenses. Poppen v. Walker, 520 NW2d 238 (SD 1994). On June 22, 1994, this Court issued its opinion holding "that video lottery is not authorized under Article III, § 25 of the South Dakota Constitution." *Id*. at 240.

[¶5.]        In response to the opinion, the South Dakota Legislature held two special legislative sessions. In the first special session on July 12, 1994, the legislature proposed to submit the video lottery issue to the voters as a constitutional amendment to article III, § 25, authorizing video lottery. *See*, SDConst, art XXIII, § 1 (providing, in part, "Amendments to this Constitution may be proposed by initiative or by a majority vote of all members of each house of the Legislature."). Laws of the 1994 First Special Session, ch 1. It was placed on the ballot as Constitutional Amendment E. Also during this special session, the legislature passed emergency legislation in order to fund state government. The legislature replaced the lost video lottery revenue with funds transferred from the budget reserve fund. Laws of the 1994 First Special Session, ch 2. In addition, the legislature passed emergency legislation to ratify certain prior video lottery legislation. Laws of the 1994 First Special Session, ch 4. The law also authorized the possession, sale, transportation and disposal of licensed video lottery machines. Laws of the 1994 First Special Session, ch 5 [sic]. In the second special session in

September 1994, the legislature addressed state budget issues. During this session, the legislature passed emergency legislation to repeal, reduce, and amend certain appropriations and to provide budget transfers. Laws of the 1994 Second Special Session, ch 1-16.

[¶6.]     In the November 8, 1994, general election, the voters reauthorized the video lottery system by approving proposed Constitutional Amendment E amending article III, § 25. 1995 South Dakota Legislative Manual at 285, 290.

[¶7.]     Six years later in 2000 the subject again was put to a vote of the people by an initiated measure seeking to repeal video lottery by removing the 1994 authorization in article III, § 25. The voters rejected the 2000 initiated attempt to repeal video lottery in the general election of November 7, 2000. 2001-2002 South Dakota Legislative Manual at 257.

[¶8.]     Before us is the most recent attempt to repeal video lottery. Video lottery opponents gathered sufficient signatures on a petition to make the issue eligible for placement on the 2006 general election ballot. The petition is entitled "An Act to Repeal the Video Lottery." It is the subject of this action.

B. Gross Receipts Tax on Wireless Telecommunications

[¶9.]     Also the subject of this action is the initiated measure to repeal the gross receipts tax on wireless telecommunications. In 2003 the legislature passed a law imposing a four percent (4%) excise tax on the gross receipts of wireless communications. 2003 SDSessL ch 58; SDCL ch 10-33A. Attempts to repeal the tax were introduced during the 2006 legislative session by Senate Bill 111 and House Bill 1106. 2006 Senate Journal at 106; 2006 House Journal at 138. Both bills failed. Senate Bill 111 was deferred by the Senate Committee on Taxation to the

36th legislative day, a legislative mechanism that killed the bill. 2006 Senate Journal at 402. House Bill 1106 was voted down by the House of Representatives after being substantially amended by the House Committee on Taxation. 2006 House Journal at 528-529. The House Committee had recommended deleting all of the language of the bill except the enacting clause and inserting language providing for a legislative study on the taxes imposed on the telecommunications industry. 2006 House Journal at 466.

[¶10.] Promptly thereafter, on March 15, 2006, an initiative petition to repeal the tax was filed. The title of the initiative is "An Act to Repeal the Four Percent (4%) Gross Receipts Tax Imposed by South Dakota Codified Laws chapter 10-33A Upon Wireless Telecommunications Services." Prior to the filing deadline, the petition sponsors filed the initiative petition with sufficient signatures to be eligible for placement on the general election ballot.

### C. Attorney General's Opinion

[¶11.] After the signatures on each petition were verified, the secretary of state requested an attorney general's opinion on the following question:

> In 1995 the Supreme Court in Christensen v. Carson (533 NW2d 712) determined that the initiative process could not be used to repeal a municipal ordinance or resolution. Does the Christensen case or the Article III § 1 "support of state government" prohibition prevent the placement of this measure on the ballot?

[¶12.] In Official Opinion No. 06-05 on May 30, 2006, the attorney general advised the secretary of state that the initiated measure seeking the repeal of the statutory authorization for video lottery and the initiated measure seeking to repeal the tax on telecommunications in SDCL ch 10-33A were not permissible uses of the

constitutional power of initiative based upon this Court's decision in Christensen v. Carson, 533 NW2d 712 (SD 1995). On June 7, 2006, the secretary of state advised each of the initiative petition sponsors that the measures would not be placed on the 2006 general election ballot.[1]

## STANDARD OF REVIEW

[¶13.] These are mandamus actions to compel the secretary of state to place each initiated measure on the ballot. "The writ of mandamus must be issued in all cases where there is not a plain, speedy and adequate remedy, in the ordinary course of law." SDCL 21-29-2. "The nature of a writ of mandamus is an extraordinary remedy that will issue only when the duty to act is clear[.]" Baker v. Atkinson, 2001 SD 49, ¶ 16, 625 NW2d 265, 271. This Court has said:

> Mandamus is a potent, but precise remedy. Its power lies in its expediency; its precision in its narrow application. It commands the fulfillment of an existing legal duty, but creates no duty itself, and acts upon no doubtful or unsettled right. To prevail in seeking a Writ of Mandamus, the petitioner *must have a clear legal right to performance of the specific duty* sought to be compelled and the respondent must have a definite legal obligation to perform that duty.

---

1.  At oral argument counsel discussed whether this issue is ripe for judicial review. Without deciding whether the issue before us is a ripe justiciable controversy, we note there are well recognized exceptions where courts address the merits of an issue. Two well recognized exceptions to the ripeness doctrine are where the matter is capable of repetition and a matter of great public importance. Sedlacek v. S. D. Teener Baseball Program, 437 NW2d 866, 868 (SD 1989). We are advised that of the forty previous proposed initiated measures to reach the general election ballot, thirty-seven would have involved either the repeal or the amendment of an existing statute (*see* footnote 8). Moreover, no one has suggested that the scope of the right of the people to propose initiated measures is not of great public importance. For this very reason we granted the right to proceed directly to this Court and are adjudicating it in an expedited manner prior to the election.

Sorrels v. Queen of Peace Hosp., 1998 SD 12, ¶ 6, 575 NW2d 240, 242 (citations

omitted)(emphasis added).

ISSUE

[¶14.]     **Does the power reserved by the people under article III, § 1 of the South Dakota Constitution "to propose measures" include the power to propose the repeal of an existing law?**[2]

DISCUSSION

[¶15.]     Article III, § 1 of the South Dakota Constitution establishes the

people's right of initiative and referendum.  It provides:

> The legislative power of the state shall be vested in a Legislature which shall consist of a senate and house of representatives.  However, the people expressly reserve to themselves the right to propose measures, which shall be submitted to a vote of the electors of the state, and also the right to require that any laws which the Legislature may have enacted shall be submitted to a vote of the electors of the state before going into effect, except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions.  Not more than five percent of the qualified electors of the state shall be required to invoke either the initiative or the referendum.
>
> This section shall not be construed so as to deprive the Legislature or any member thereof of the right to propose

---

2.     There obviously is a definitional distinction in a dictionary between a "repeal" and an "amendment."  *See* Black's Law Dictionary, repeal/amendment distinguished at 1299 (6th ed 1993).  However, both actions have a significant effect on an existing statute.  The text of the constitution makes no distinction between the two.  Neither historical analysis nor early case law support a legal differentiation.  Logically if a repeal is within the scope of the power to initiate measures, an amendment is permissible.  If an amendment is to be given different legal status than a repeal, we enter the world of hair-splitting distinctions between what is a 99.9999 percent decrease in a tax by amendment of a statute versus an outright repeal.  With no more support of a legal distinction than this, for purposes of this issue, we treat the legal effect of a repeal and an amendment upon an existing statute as a distinction without a legal difference.

> any measure. The veto power of the Executive shall not be exercised as to measures referred to a vote of the people. This section shall apply to municipalities. The enacting clause of all laws approved by vote of the electors of the state shall be: "Be it enacted by the people of South Dakota." The Legislature shall make suitable provisions for carrying into effect the provisions of this section.

Thus, the initiative is the people's "right to propose measures" while the referendum is the people's right "to require that any laws which the legislature may have enacted shall be submitted to a vote of the electors of the state before going into effect[.]"

[¶16.] When determining the meaning of a constitutional provision, we normally would examine the language of the provision. Where a constitutional provision is quite plain in its language, we construe it according to its natural import. If the provision is ambiguous, we look to secondary sources for guidance. State v. Pyle, 55 SD 269, 271, 226 NW 280, 281 (1929); In re Janklow, 530 NW2d 367, 370 (SD 1995). We have said:

> "In the past, . . . secondary sources outside of the text of the constitutional provision have provided us with assistance." *See* Wegleitner v. Sattler, 1998 SD 88, ¶ 11, n 3, 582 NW2d 688, 692. The "historical context" of a constitutional provision is a guide to its interpretation. Cleveland v. BDL Enterprises Ins., 2003 SD 54, ¶ 40, 663 NW2d 212, 223.

Doe v. Nelson, 2004 SD 62, ¶ 10, 680 NW2d 302, 305-306. While some argue that the above constitutional provision is plain upon its face, our decision in *Christensen* appears to have created an ambiguity.

[¶17.] *Christensen* examined a municipal initiated measure that sought to "cease any and all activities" relating to the acquisition and construction of a new airport facility. The Court in a three-two decision held that the petitions in

question were referendum petitions rather than initiative petitions, and, therefore,

had failed to satisfy the requirements of the referendum process.

[¶18.]         In broad language, the majority opinion in *Christensen* said:

> Unfortunately, *Christensen* confuses the powers of
> initiative and referendum and *mistakenly assumes that
> an initiative may be used, like a referendum, to repeal or
> amend previously passed legislation.* Settled South
> Dakota law does not permit this result. The South
> Dakota Constitution, the South Dakota Code, and settled
> South Dakota case law clearly distinguishes between
> initiative and referendum measures. (emphasis added; no
> authority cited).

*Christensen,* 533 NW2d at 714.

> While the constitution reserves both initiative and
> referendum powers to the people, it excepts from the
> referendum process any laws which were enacted "for the
> immediate preservation of the public peace, health or
> safety, support of the state government and its existing
> public institutions." SDConst, art III, § 1. This exception
> does not apply to the initiative process, *id.; Byre,* 362
> NW2d at 79, *presumably because initiatives are not
> intended to affect existing laws.* If we were to allow the
> distinction between initiative and referendum to be
> blurred, as *Christensen* seems to suggest, voters could
> avoid the restrictions on the referendum power by simply
> fashioning their petition in the form of an initiative. We
> refuse to endorse this result, because doing so *would
> effectively nullify a constitutional provision.* (emphasis
> added; no authority cited).

*Id.* at 715.

> The legislature recognized that only a referendum is
> designed to pass on existing laws; no restrictions on
> initiative powers were necessary, *because initiatives were
> not intended to conflict with or repeal current laws.*
> (emphasis added; no authority cited).

*Id.*

[¶19.]     This language from *Christensen* suggests that the attempts to repeal video lottery and the gross receipts tax imposed on wireless telecommunications are beyond the scope of the people's power of initiative because they are attempts to repeal current law.  The secretary of state and attorney general relied on language in *Christensen* to conclude the measures should not be placed on the ballot.  We find no improper motive with the position taken by the secretary of state or the attorney general regarding *Christensen*.  As constitutional officers of the State they were bound to follow *Christensen*, which, although it had a strong dissent, was still the latest decision from this Court on the subject.[3]

---

3.     Under the South Dakota Constitution this Court is charged with the ultimate interpretation of that document and the constitutionality of statutes enacted by the legislature.  In the early case of McCoy v. Handlin, 35 SD 487, 493, 153 NW 361, 363 (1915) the then state auditor declared:  "I believe the statute to be unconstitutional, and I deny to the judiciary of the state the right to determine the correctness of my views . . .."  This Court concluded otherwise and issued a writ of mandamus to the auditor to enforce the ministerial acts of his office.

In the case now before us, the secretary of state and the attorney general correctly followed our fundamental constitutional analysis set forth in *Handlin:*

> It is certainly a novel and a startling proposition that, under the constitution vesting the *judicial powers* of the state in her *courts*, an . . . *executive officer* has the right and power to disregard the plain provisions of a statute and refuse to perform a purely *ministerial act* required of him thereunder, thus depriving another of a property right conferred by such statute . . .. (emphasis original).

*Handlin,* 35 SD at 493, 153 NW at 363.

Brendtro and Verizon find fault with the secretary of state and attorney general's reliance upon *Christensen* and claim it to be no more than reliance upon *obiter dictum*.  Even if correct, it does not relegate that portion of an opinion of this Court to irrelevance.

[¶20.]     Here, we are asked to reconsider that portion of our writing in *Christensen,* which suggests that an initiative cannot be used to repeal an existing law. We do so in the context of the history of the initiative and referendum in South Dakota, South Dakota case law, and the language of article III, § 1.[4]

## History of Initiative and Referendum

[¶21.]     The historical background of the South Dakota constitutional provision on initiative and referendum can be traced to the Constitutional Convention of 1885. On September 12, 1885, the Constitutional Convention of Dakota Territory considered W.H. Lyon's petition for direct legislation by the people. The petition called for all general laws to be submitted to a vote of the people and gave the

---

"It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. *If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.* The reason for the maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated."

*Handlin,* 35 SD at 502, 153 NW at 367 (quoting Cohen v. Virginia, 6 Wheat, 264, 399, 5 LEd 257).

4.   Our attention has been called to case law from other states that deal with this issue. In other cases we have been assisted by relying on case law from other states, especially those that have constitutional provisions which South Dakota may have copied or relied upon in drafting its constitution. However, in this instance, South Dakota was the first state in the country to adopt initiative and referendum, George Martin Smith, *South Dakota: Its History and Its People* at 680 (1915). Moreover, it is clear that the impetus for this movement was not from external sources but was rather a long-standing movement within our own borders. 1 Doane Robinson, *South Dakota: Sui Generis* at 351-353 (1930) (hereinafter *Robinson*).

#24139, 24162

legislature only the power to pass appropriation and certain other necessary laws.

The petition read:

Petition

> I respectfully request that this Convention incorporate a provision in this constitution, that all appropriation bills for new public institutions, and permanent improvements to existing institutions, and all laws of general interest to the people should be drafted by the Legislature, and submitted for the people to enact or reject, at annual or biennial elections, and that the Legislature be given only the power to pass appropriation bills for the ordinary running expenses of the State, and to enact the necessary laws of a local, special and private nature, that can not well be provided for by general acts.  Respectfully,  W.H. Lyon.

1885 South Dakota Constitutional Debates 113.[5]  The convention rejected the petition and instead recommended that:  "The legislative power shall be vested in a legislature which shall consist of a Senate, and a House of Representatives."  1885 South Dakota Constitutional Debates 138.

[¶22.]    The Constitution of the State of South Dakota was overwhelmingly adopted by popular vote on October 1, 1889.  Constitution of South Dakota, 1 South Dakota Codified Laws at 191 (West).  South Dakota Constitution, article VI, § 26 provided, as it does today:

> All political power is inherent in the people, and all free government is founded on their authority, and is instituted for their equal protection and benefit, and they have the right in lawful and constituted methods to alter or reform their forms of government in such manner as they may think proper.  And the state of South Dakota is

---

5.    There is no record of this being raised either in the 1883 or the 1887 Constitutional Conventions.  *See Journal of the 1883 Constitutional Convention*, South Dakota Department of History Collections at 291 (1942) and *Statehood for Dakota-Proceedings of the Territorial Convention of 1887*, South Dakota Department of History at 469 (1942).

> an inseparable part of the American Union and the
> Constitution of the United States is the supreme law of
> the land.

Thus, under our system of government the powers of government are derived from the people.

[¶23.] The language of article III, § 1 of the constitution adopted in 1889 mirrored that proposed by the 1885 constitutional convention: "The legislative power shall be vested in a legislature, which shall consist of a senate and house of representatives." This section of the constitution "granted to the legislature the legislative power of the state without reservations," *Pyle*, 55 SD at 271, 226 NW at 281, and was only subject to the veto of the governor. Hodges v. Snyder, 43 SD 166, 178 NW 575 (1920). Pursuant to article III, § 22, of the 1889 constitution, no legislative act could take effect until ninety days after the adjournment of the session at which it was passed unless an emergency was declared by a two-thirds vote of all the members of each house. In that case, "such act took effect immediately upon its passage and approval[.]" *Hodges*, 43 SD at 174, 178 NW at 577.

[¶24.] The movement for the initiative and referendum began in 1885 and continued for the next thirteen years as the Farmer's Alliance, the Knights of Labor, the Initiative and Referendum League, and the Populist Party kept the issue before the people through a non-partisan educational campaign that turned into a political movement. *Robinson* at 351-354; H. Roger Grant, *Origins of a Progressive Reform: The Initiative and Referendum Movement in South Dakota*, Vol 3, No 4 South Dakota History 390 (1973); *see also History of the Initiative and Referendum in South Dakota*, Legislative Reference Bulletin No 3 (Pierre 1918); Burton

-12-

Ellsworth Tiffany, *The Initiative and Referendum in South Dakota*, South Dakota Historical Collections 12 (1924). The movement was spurred by economic unrest, the complacency of political leaders, as well as a spirit of political independence. Herbert S. Schell, *History of South Dakota* 223 (3d ed, revised, University of Nebraska Press 1975). Direct democracy was seen as a way to "cleanse the legislative process." *Grant, supra*, Vol 3, No 4, South Dakota History at 394. The movement gained the platform to successfully launch this proposal when in 1896 the Populists gained control of both houses of the legislature and the governorship. Herbert S. Schell, "Andrew E. Lee," *Over a Century of Leadership: South Dakota Territorial and State Governors* 67-69.

[¶25.]     In 1897 a majority of the members of each house of the legislature then controlled by the Populists, proposed amending article III, § 1 of the constitution to provide for the initiative and referendum. In the ensuing campaign, Populist Governor Andrew O. Lee, a chief proponent of the proposal, argued that the passage of the initiative and referendum would "end the powers of special interests, save taxpayers money, and enable citizens to secure various pieces of needed legislation." *Schell*, "Andrew E. Lee," *Over a Century of Leadership* at 68.

[¶26.]     The electorate approved the amendment on November 8, 1898. This amendment provided for initiative and referendum as follows:

> The legislative power of the state shall be vested in a legislature which shall consist of a senate and house of representatives, except that the people expressly reserve to themselves the right to propose measures, which measures the legislature shall enact and submit to a vote of the electors of the state, and also the right to require that any laws which the legislature may have enacted shall be submitted to a vote of the electors of the state before going into effect, except such laws as may be

necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions.

Provided, that not more than five per centum of the qualified electors of the state shall be required to invoke either the initiative of the referendum.

This section shall not be construed so as to deprive the legislature or any member thereof of the right to propose any measure. The veto power of the executive shall not be exercised as to measures referred to a vote of the people. This section shall apply to municipalities. The enacting clause of all laws approved by vote of the electors of the state shall be, "Be it enacted by the people of South Dakota." The legislature shall make suitable provisions for carrying into effect the provisions of this section.

By adopting this amendment the people expressly reserved to themselves "the right to propose measures," the initiative, as well as "the right to require that any laws which the legislature may have enacted shall be submitted to a vote of the electors of the state before going into effect," the referendum.[6]

---

6. On seven occasions since it was enacted in 1898 proposed amendments to article III, § 1 have been submitted to a vote of the people. 1913 SDSessL ch 132; 1921 SDSessL ch 146; 1969 SDSessL ch 242; 1974 SDSessL ch 1; 1975 SDSessL ch 2; 1980 SDSessL ch 2; 1987 SDSessL ch 2. All but one amendment was rejected by the voters. Those rejected included 1913, 1921, and 1969 proposed amendments changing the number of electors required to invoke the initiative or referendum, 1974 and 1975 proposed amendments *excepting appropriations from the initiative power*, and a 1980 proposal to restrict the legislature from changing laws voted on by the people. The only proposal to be approved was a 1987 amendment that deleted the provisions requiring the legislature to enact proposed initiated measures. The rejection of the majority of proposed amendments to article III, § 1 indicates its "popular approval" after 117 years of operation, *Pyle*, 55 SD at 273, 226 NW at 282, as well as the determination of South Dakotans to protect their right to place measures on the ballot.

[¶27.]	The first statewide use of the initiative and referendum was at the November 1908 general election.  1909 South Dakota Legislative Manual at 373.  The people initiated an act to provide for the licensing, restricting and regulation of the business of the manufacture and sale of spirituous and intoxicating liquors.  1907 SDSessL ch 179.  Section 6 of this act provided:  "All acts and parts of acts in conflict with this act are hereby repealed."  1907 SDSessL ch 179 § 6.[7]

[¶28.]	*Robinson* reports numerous other attempts at initiative following its constitutional adoption.  Some proposals passed while many did not.  Despite numerous attempts to amend existing laws, nowhere in our reported decisions of that era was the claim advanced that initiatives may not repeal or amend existing state laws adopted by the legislature.  Quite to the contrary, in several instances they did.[8]  While not dispositive, we have found that how drafters and the courts treat amendments in the years following the enactments provides guidance in our interpretation.  *Doe*, 2004 SD 62 at ¶ 7, 680 NW2d at 307.

## Caselaw

[¶29.]	In one of its earliest comments on the initiative, the Court observed that "[t]he [Legislature's] power is only concurrent with the power of the people to

---

7.	The voters rejected this initiated measure by a margin of 41,405 to 39,075.  1909 South Dakota Legislative Manual at 373.  The people also referred three laws enacted by the legislature dealing with divorce, 1907 SDSessL ch 132, the protection and preservation of quail, 1907 SDSessL ch 158, and the prohibition of theatrical performances on Sunday.  1907 SDSessL ch 234.  In each case a majority of the voters voted for the act and it went into effect.  1909 South Dakota Legislative Manual at 373-374.

8.	Verizon notes that since 1898, forty initiated statutory measures have been submitted to the electors.  Twenty-two contained repeal language while fifteen amended existing statutes.

initiate a law on any subject." *Pyle*, 55 SD at 272, 226 NW at 281. This continued to be the unchallenged state of the law until 1985 when this Court decided Byre v. City of Chamberlain, 362 NW2d 69 (SD 1985). There, rather than relying on our prior constitutional history and case law, the Court cited only to 82 CJS *Statutes* § 116 (1953) for the proposition that:

> The purpose of the initiative is not to curtail or limit legislative power to enact laws, but rather to compel enactment of measures desired by the people, and to empower the people, in the event the legislature fails to act, to enact such measures themselves.

362 NW2d at 79.[9] Then *Christensen* concluded that "initiatives are not intended to affect existing laws," 533 NW2d at 715, citing as its only authority the above rationale of *Byre*.

[¶30.]     The *Christensen* limitation on the initiative appears inconsistent with the historical context of the adoption of the initiative and the proponents' intent. When the right of initiative was adopted in 1898, the bedrock of our current statutory framework was already in place and the State had a well-developed criminal and civil code that regulated significant aspects of governmental, societal

---

9.     Apparently the editors of CJS have now concluded otherwise. The 1999 edition of 82 CJS *Statutes* § 114 now states:

> An initiative may repeal a statute, expressly or by implication, . . . . Initiative may be used to create legislation which voters cannot vote on through referendum.

More fundamentally, the crucial sentence of the 1953 edition of CJS cites as its authority for its statement, "and to empower the people, in case the legislature fails to act, to enact such measures themselves," this Court's opinion in *Whisman*, 36 SD at 272, 154 NW at 711. A review of *Whisman* establishes that it does not contain those crucial words as is attributed to it by the 1953 edition of CJS. Thus, there was no primary authority for the statement to begin with.

and individual life. To hold that the initiative can be used only where the legislature has not acted would adopt a constitutional interpretation that would effectively relegate the initiative to the most insignificant aspects of our society and lives. "This Court will not construe a constitutional provision to arrive at a strained, unpractical or absurd result." Breck v. Janklow, 2001 SD 28, ¶ 12, 623 NW2d 449, 455.

[¶31.]     The *Christensen* view of the initiative also appears inconsistent with constitutional provisions referring to the initiatives that were passed in the time frame surrounding that decision. In 1978 the voters approved article XI, §13 of the South Dakota Constitution. The provision clearly assumes that within the scope of the amendment, an initiative is a permissible method of dealing with taxation on real or personal property:

> The rate of taxation imposed by the state of South Dakota on personal or corporate income or on sales or services, or the allowable levies or the percentage basis for determining valuation as fixed by law for purposes of taxation on real or personal property, *shall not be increased unless by consent of the people by exercise of their right of initiative* or by two-thirds vote of all the members elect of each branch of the Legislature. (emphasis added).

[¶32.]     Article XI, § 14 also supports the authority of the people to repeal a statute through the initiative process. It was passed in 1996 a year after this Court decided *Christensen.* It states:

> The rate of taxation imposed by the State of South Dakota in regard to any tax may not be increased and no new tax may be imposed by the State of South Dakota *unless by consent of the people by exercise of their right of initiative* or by two-thirds vote of all the members elect of each branch of the Legislature. (emphasis added).

This article clearly contemplates that an existing tax, which originates from a statute, may be amended or repealed though the initiative process. Moreover, in our recent case of Schulte v. Long, 2004 SD 102, 687 NW2d 495, we had before us an issue concerning a ballot initiative to repeal the sales tax on food. In his concurring opinion Justice Zinter observed that "[t]he legal *and* practical effect of this measure is to repeal a tax[.]" (emphasis original). 2004 SD 102 at ¶ 29, 687 NW2d at 502.

[¶33.] *Christensen* was largely premised on the distinction between the initiative and referendum and avoiding the use of the initiative to nullify the referendum provision of article III, § 1. According to article III, § 1:

> two classes of laws . . . are not subject to the referendum: First, such laws as are declared by the act itself to be necessary for the immediate preservation of the public peace, health, or safety of the state; and second, such laws as are necessary for the support of state government and its existing public institutions.

*Hodges,* 43 SD at 174, 175, 178 NW at 577. Excepting "laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing institutions" from the people's power to refer laws assured "that the wheels of the state and its existing institutions would be kept turning and the public peace, health and safety not be wholly left to the mercy of deferred political campaigns." *Pyle*, 55 SD at 273, 226 NW at 281. The exceptions to the referendum constitute "an additional grant of power to the legislature, and, if any part of the grant is to be strictly construed it is [these] exception[s]," *Pyle,* 55 SD at 272, 226 NW at 281, while the reserved powers of initiative and referendum are not strictly construed. *Id.*

-18-

## Language of Article III, § 1

[¶34.]        Notwithstanding the exceptions to the referendum, the language in article III, § 1 reserving the power of initiative is clear:  "[T]he people expressly reserve to themselves the right to propose measures[.]"  Article III, § 1.  Its clarity was recognized in *Pyle*:

> [Article III, § 1] is quite plain in its language, which must be construed according to its import where there is no ambiguity.  Though it may have been an experiment in government and the product of extremists in turbulent times, it cannot be ignored.  The fact that more conservative men are unable to suggest a construction in accord with their views of conservative government is evidence that its language is not ambiguous.

*Pyle*, 55 SD at 273, 226 NW at 281.  "In the absence of ambiguity, the language in the constitution must be applied as it reads" and this Court is obligated to apply its "plain meaning."  *Janklow*, 530 NW2d at 370.

[¶35.]        Indeed, while article III, § 1 gives the legislature power in areas excluded from the scope of the referendum, the power is not exclusive.  It is concurrent with the people's right to initiate measures.  As stated in *Pyle*:

> The legislature is not given exclusive power in the excepted field.  The power is only concurrent with *the power of the people to initiate a law on any subject.*  The exception applies only to the referendum and *the initiative is as applicable in this field as anywhere.*

*Pyle*, 55 SD at 272, 226 NW at 281.  (emphasis added).  The people's power to initiate laws on any subject, including those excluded from the scope of the referendum, is concurrent with the legislature's authority to propose measures.  SDConst, art III, § 1.  There is nothing in the 1898 amendment to article III, § 1 "which, either expressly or impliedly, in any degree, conflicts with, inhibits, limits,

abridges, or prohibits any part of the *legislative power* originally granted to it to *react, amend, or repeal any law* which it might have enacted before the adoption of this amendment." *Whisman*, 36 SD at 269, 154 NW at 709. (emphasis added). Consequently, the people's power to propose measures includes the legislative power to repeal laws.

[¶36.]     In support of *Christensen's* interpretation of the limited scope of the 1898 amendment to article III, § 1, the secretary of state contends that the public debate surrounding the campaign of 1898 was limited to the extent of the limitations on the referendum. From this the secretary of state concludes the initiative was relegated to a secondary status that could not be used to set aside acts of the legislature. Legislative acts could only be set aside by the people under referendum. *See Tiffany, supra,* 350 at n 27. A reading of the constitutional text does not support such a limited view. We must assume the drafters said what they meant and meant what they said. Gloe v. Union Ins. Co., 2005 SD 30, 694 NW2d 252. Further, although far from dispositive, impassioned statements such as those made by Governor Lee during the 1898 campaign to secure passage of the right of initiative are anything but indifferent. *See Schell*, "Andrew E. Lee," *Over a Century of Leadership* at 68.

[¶37.]     Despite the statement to the contrary in *Christensen*, the people's power to initiate measures to repeal existing laws does not blur the distinction between the initiative and referendum or nullify the referendum provision of article III, § 1. The referendum allows the people to vote on a legislatively enacted law before it takes effect except when the law is necessary for the immediate preservation of the public peace, health or safety or the support of state government

and its existing public institutions.  SDConst, art III, § 1.  "[I]t is in effect the exercise of veto power."  State v. Summers, 33 SD 40, 50, 144 NW 730, 732 (1913).  The initiative allows the people to propose new laws and to repeal current laws that after the passage of time are reviewed as undesirable or unnecessary.

[¶38.]     The people's power to initiate measures to repeal existing laws, including revenue generating laws initially declared emergency legislation, is not without safeguards.  Initiative petitions must be filed in the secretary of state's office by the first Tuesday in May of a general election year.  SDCL 2-1-2.  In the case of an initiated measure that seeks to repeal existing law, the existing law and, in the case of a revenue generating law, the revenue, remains in place and unaffected for at least six months between the filing of the petition and the general election.  This allows for stability in government while the electorate debates the merits of the proposal.  It also allows for legislative planning to prepare for circumstances arising if the repeal is successful.[10]  Should the voters approve an initiative to repeal existing law, the repeal becomes effective the day after the completion of the official canvass by the State Canvassing Board.  SDCL 2-1-12.[11]

---

10.     This may include the legislative repeal or amendment of an initiated measure.  *Whisman,* 36 SD at 269, 154 NW at 710.  We note that in 1993 the legislature amended a 1984 initiated measure prohibiting schools from opening before Labor Day.  1984 SDSessL ch 118; 1993 SDSessL ch 133.

11.     We are also asked to ascertain whether the secretary of state possesses a ministerial or discretionary duty to place initiatives on the ballot.  Given our disposition above, we need not address this additional matter.  Even if it were deemed to be a discretionary duty, we have held that an error of law can be by definition an abuse of discretion.  Halls v. White, 2006 SD 47, 715 NW2d 577.

CONCLUSION

[¶39.] Thus based on an examination of the history of the initiative and referendum in South Dakota, South Dakota case law, and the language of article III, § 1, we conclude that the people's power to propose measures includes the power to propose repeal of existing laws. Therefore, *Christensen* is overruled to the extent that it is inconsistent with this opinion. Petitioners have demonstrated that they have a clear legal right to have each initiated measure placed on the ballot. The secretary of state has the definite legal obligation to place each measure on the ballot. Accordingly, the writs of mandamus will issue.

[¶40.] SABERS, Justice, ZINTER, Justice and MEIERHENRY, Justice, concur.

[¶41.] KONENKAMP, Justice, concurs with writing.

KONENKAMP, Justice (concurring).

[¶42.] I concur with the Court's opinion. The language in Christensen v. Carson, 533 NW2d 712 (SD 1995) was overbroad. Judges have an obligation to reexamine their views when superior proof is brought forth to challenge previous understandings. For me, such is the case here.