GILBERTSON, Chief Justice
(concurring in result).
[¶ 72.] The Court holds today that Plaintiffs have failed to establish beyond a reasonable doubt a constitutional violation of Article VIII of the South Dakota Constitution. I agree. The meaning of Article VIII and its history do not support the heightened legal interpretations advocated by Plaintiffs. Furthermore, Plaintiffs have not shown that the trial court’s findings of fact were clearly erroneous or conclusions of law were in error. Having failed on both the factual and legal claims, I would not reach the issue of causation. For these reasons, I concur in result.
THE LEGAL ISSUE
[¶ 73.] Although the issues in this proceeding appear to have undergone several changes throughout the course of this litigation, I agree with the Court that Plaintiffs now seek a declaratory ruling that Article VIII, Sections 1 and 15 of the South Dakota Constitution mean: (1) “that the South Dakota Constitution entitles all children to a free, adequate and quality public education”; and, (2) “that the present system of funding is unconstitutional because it does not provide all children with an adequate and quality education.” Plaintiffs go further, however, and based upon cases from other jurisdictions, seek recognition of an enhanced status for education as a “fundamental right.”[35]
[¶ 74.] Unlike cases in some other states, Plaintiffs do not seek an order from this Court for monetary relief directed towards the Legislature. This is appropriate because in Olson v. Gnindon, 2009 S.D. 63, ¶ 23, 771 N.W.2d 318, 324 (Gilbertson, C.J., concurring), the appellants conceded that “there is no Constitutional authority for this Court to declare itself to be some kind of ‘super school board,’ that is now ... de facto, running the education system of South Dakota.” Neither are we a “super legislature” constitutionally empowered to make school funding decisions. San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 31, 93 S.Ct. 1278, 1295, 36 L.Ed.2d 16 (1973). This is recognition that the doctrine of separation of powers has been “fundamental bedrock” to the successful operation of our state government since South Dakota became a state in 1889. Gray v. Gienapp, 2007 S.D. 12, ¶ 19, 727 N.W.2d 808, 812.[36]

The Historical Background of Article VIII, Sections I and 15

[¶ 75.] The significance of the history behind this constitutional provision and how it was subsequently implemented is crucial to an analysis of Plaintiffs’ legal *643 claims. In the course of their legal argument, Plaintiffs relied heavily on such analysis. This constitutional history establishes that Article VIII sets an educational floor which allows the Legislature, in its discretion, to address the subject of additional state aid to education as part of its constitutional prerogatives.
[¶ 76.] “The Constitution is the mother law. It is not the baby. Statutes must conform to the Constitution, not vice ver-sa.” Poppen v. Walker, 520 N.W.2d 238, 242 (S.D.1994) (overruled on other grounds) (quoting Cummings v. Mickelson, 495 N.W.2d 493, 507 (S.D.1993) (Henderson, J., concurring in part and dissenting in part)). Our constitutional provisions are a limitation on legislative authority, not a grant of power to the Legislature. Gray, 2007 S.D. 12, ¶ 22, 727 N.W.2d at 813; Breck v. Janklow, 2001 S.D. 28, ¶ 9, 623 N.W.2d 449, 454. As such, legislative enactments concerning education and its funding are presumed to be constitutional. See City of Pierre v. Blackwell, 2001 S.D. 127, ¶ 9, 635 N.W.2d 581, 584 (“it is well settled in this state that any legislative enactment is presumed reasonable, valid and constitutional”).
[¶ 77.] “[T]he object of constitutional construction is ‘to give effect to the intent of the framers of the organic law and the people adopting it.’ ” Doe v. Nelson, 2004 S.D. 62, ¶ 12, 680 N.W.2d 302, 307 (quoting Poppen, 520 N.W.2d at 242). “Where a constitutional provision is quite plain in its language, we construe it according to its natural import.” Brendtro v. Nelson, 2006 S.D. 71, ¶ 16, 720 N.W.2d 670, 675. However, both parties concede that the text of Article VIII is not sufficiently specific to allow resolution of this suit by merely looking to the words of the text. Such terms of Article VIII, Sections 1 and 15 as “a general and uniform system of public schools,” “adopt all suitable means to secure the people the advantages and opportunities of education” and a “thorough and efficient system of common schools” are not drawn as to allow an absolute definition.[37] As such, it is appropriate that we look to secondary sources. Brendtro, 2006 S.D. 71, ¶ 16, 720 N.W.2d at 675; Doe, 2004 S.D. 62, ¶ 10, 680 N.W.2d at 305-06. *644 This includes the intent of the drafting bodies and the historical context of the provision. Doe, 2004 S.D. 62, ¶ 10, 680 N.W.2d at 805-06.
[¶ 78.] Dakota Territory was created in 1861. Only months later, at its first meeting, the Dakota Territorial Legislature passed a comprehensive act creating the first territorial-wide educational system. 1862 Dak. Terr. Sess. Laws ch. 81. Free access to public education was addressed:
The district schools established under the provisions of this act, shall at all times be equally free and accessible to all the white children residents therein over five and under the age of twenty-one years, subject to such regulations as the district board in each may prescribe.
1862 Dak. Terr. Sess. Laws eh. 81, § 40.[38] As recounted in the Memoirs of Gen. William Henry Harrison Beadle, as the Dakota Territory grew so did its educational system. See Personal Memoirs of General William Henry Harrison Beadle with Editorial Notes by Doane Robinson, in 3 South Dakota Historical Collections 153-54 (1904).
[¶ 79.] The subject of education would play a significant part at the numerous attempts to achieve statehood for what was to become the State of South Dakota. Three constitutional conventions were held in 1883, 1885 and 1889 before statehood was achieved. See generally David E. Gil-bertson and David S. Barari, Indexing the South Dakota Constitutional Conventions: A 21st Century Solution to a 125 Year Old Problem, 53 S.D. L.Rev. 260 (2008).
[¶ 80.] The 1883 Convention sought to create a system of schools funded by income from the sale of public lands and “[t]he Legislature shall make such provision by taxation or otherwise, as with the revenue from the permanent school fund, shall secure a thorough and efficient system of common schools throughout the State.” Constitutional Convention of 1883 Art. VIII, reprinted in 21 South Dakota Historical Collections 326-34 (Hippie Printing Co., 1942).[39] According to George W. Kingsbury, the proposed constitution of 1883 would serve as a model for the delegates of the next constitutional convention in 1885. Kingsbury, 2 History of Dakota Territory: South Dakota — Its History and Its People 1737 (George Martin Smith, ed., S.J. Clarke Publ. Co., 5 vols., 1915).[40]
[¶ 81.] More in-depth examination of the Constitutional Convention of 1885 is required because at that convention Gen. *645 Beadle drafted the text of what later became Article VIII. This draft was initially adopted by the 1885 Convention. Memoirs of Gen. Beadle, supra, at 178, 214-15.[41] The text of the 1885 Convention was carried forward to the 1889 Constitutional Convention[42] which became Article VIII of the South Dakota Constitution[43] in 1889. 2 South Dakota Constitutional Debates 250-60 (Huronite 1907).[44]
[¶ 82.] When reviewing the journals of the three constitutional conventions, the only source of significant debate in regards to education was the minimum price set for sale of public school lands. Looking both inside and outside the constitutional halls at contemporary histories such as Kingsbury and the Gen. Beadle Memoirs, the issue of education was not a clash of the titans; it was rather a consensus that public education should be free to .all, at taxpayer expense, as it had been since 1861. Typical of the attitude of the times was a subsequent statement made by this Court in State ex rel. Eveland v. Erickson, 44 S.D. 63, 182 N.W. 315, 316 (1921). “[D]uring the whole history of our nation, religion and education have been recognized as the foundation pillars of American Civilization.” Id. We have held that when construing the South Dakota Constitution, we “may also consider the circumstances under which a constitutional provision was formed, the general spirit of the times, and the prevailing sentiment of the people.” Poppen, 520 N.W.2d at 246-47.

*646
Application of Article VIII’s History to Present Case

[¶ 83.] Plaintiffs argue that statehood brought forth a new era in education and that much of the first legislative session in 1890 “was spent on the vastly important educational bill.” However, when one reviews the first South Dakota Session Laws, there are no radical shifts in educational policy from the Territorial period. A review of the 1890 Session Laws indicates only two small enactments dealing with education; one requiring the teaching of the effect of alcohol on the human system and a second abolishing the State Board of Education. 1890 S.D. Sess. Laws chs. 82 & 83.[45] Instead, the 1890 Legislature dealt with the subject of education as with others by enacting a statute which carried over all Territorial Laws to the State laws unless repealed or amended. 1890 S.D. Sess. Laws 254, ch. 105. This theme was reinforced by this Court in the early case In re State Census, 6 S.D. 540, 62 N.W. 129 (1895). Therein we noted that:
There appear to be three classes of provisions in the [CJonstitution. The first class embraces constitutional provisions negative and prohibitory in their character, and are self-executing. All the laws, therefore, in force when the constitution was adopted, in conflict with these provisions, were necessarily abrogated, and laws subsequently enacted in conflict therewith would necessarily be void, in so far as they conflict with such provisions.
Id. at 130. Yet, there is no suggestion that the Territorial Laws concerning education somehow ran afoul of Article VIII; instead they were carried forward.
[¶ 84.] This view of the history of our constitutional period has stood the test of time. Jon Lauck’s recent study of the pre-constitutional period of the 1880’s unearths no major battles over the educational provision or, after statehood, any claims of failure to comply with Article VIII. See Jon Lauck, Prairie Republic — The Political Culture of the Dakota Territory 1879-1889 (University of Oklahoma Press 2010).
[¶ 85.] This history indicates that Article VIII of the South Dakota Constitution did not chart a new path previously unknown in this jurisdiction. The year 1889 did not usher in a revolution in education. Rather, it was a continuum of the past with similar goals of improvement. While the drafters were studious of constitutions adopted in other states, all three proposed constitutions were “home-grown” documents.
[¶ 86.] Many of those who were in leadership positions at the Constitutional Conventions and spoke frequently on important subjects were to become the governors, legislators and judges of the new State of South Dakota. Wegleitner v. Sattler, 1998 S.D. 88, ¶ 11 n. 3, 582 N.W.2d 688, 692 n. 3. Thus, the new state officials were familiar with the text of Article VIII. It seems inconceivable that delegates to the Constitutional Convention of 1889 would subsequently take their seats in the Governor’s Chairs and the Legislatures of South Dakota and promptly ignore the oath they had taken to support the Constitution of the State of South Dakota which they had just authored months before.[46] *647 Rather it points to a belief on the part of the early South Dakota government officials that the State was in compliance with its constitutional mandate.
[¶ 87.] The early history of South Dakota after statehood is also consistent with that view. In 1905, in the Fourth Annual Review of Progress of South Dakota, the South Dakota Historical Society declared, “All the state educational institutions, from the common schools to the university, as well as the private schools and colleges, are in a flourishing condition.” Fourth Annual Review of the Progress of South Dakota for 1905, 3 South Dakota Historical Collections 33 (1906). Moreover, Gen. Beadle’s 1906 Memoirs, frequently cited by Plaintiffs, evidence no thought that the State since 1889 was out of compliance with its constitutional educational obligations. Instead, a jubilant Gen. Beadle declared, “[n]ever before in its history has the [S]tate of South Dakota been so prosperous as at the present time.” Memoirs of Gen. Beadle, supra, at 239.
[¶ 88.] There are no cases from this Court between 1889 to the present concerning claims such as are now before us, that being the issue of the State’s failure to comply with funding mandates of Article VIII.[47] However, this Court in an early case did recognize the authority of the Legislature over education including financial effects on taxpayers. Stephens v. Jones, 24 S.D. 97, 123 N.W. 705, 707 (1909). In Stephens, we held that absent a constitutional limitation, the Legislature had the inherent plenary power to create or alter school districts “although it may make taxation more burdensome.” Id. Later, in State ex rel. Finger v. Weedman, 55 S.D. 343, 226 N.W. 348, 364 (1929), we did have occasion to comment that Article VIII, Section 1 was a “mandate to the Legislature to provide a system of schools wherein education in ‘morality and intelligence’ shall be given to all.”
[¶ 89.] Plaintiffs argue that various legislative enactments over the years “expressly recognized that, for the benefit of the people of the State of South Dakota and the improvement of this and future generations of youth, it is essential that all of our youth be given the fullest opportunity to learn and develop their intellect and their skills to become productive and contributing members of society.”[48] This argument that subsequent legislative enactments amounted to a de facto amendment of Article VIII suffers from two flaws. First, as has been previously noted, the Constitution is the “mother law.” Poppen, 520 N.W.2d at 242. Thus, the Legislature cannot define the scope of a constitutional provision by subsequent legislation. Id. Second, it is illogical to say that the Legislature has raised the constitutional bar in education policy defining what constitutes an adequate education by enacting various statutes to that effect and yet simulta *648 neously is the source of the problem by failing to create a mechanism which produces that quality of education it authorized. While the Legislature certainly has the constitutional prerogative to enact statutes which enhance the quality of an education, that is a far cry from saying it is mandated to do so by Article VIII.
[¶ 90.] Justice Oliver Wendell Holmes Jr. observed that constitutional provisions must be allowed some play “for the joints of the machine.” Green v. Siegel, Barnett & Schutz, 1996 S.D. 146, ¶ 32 n. 11, 557 N.W.2d 396, 405 n. 11 (quoting Mo., Kan. & Tex. Ry. Co. of Tex. v. May, 194 U.S. 267, 268, 24 S.Ct. 638, 639, 48 L.Ed. 971 (1904)). Phrases such as “general and uniform,” “all suitable means,” “advantages and opportunities of education,” and “thorough and efficient system of common schools” invite such an approach.
[¶ 91.] Such words, however, are far from meaningless. At oral argument, the State suggested that the Legislature possessed the constitutional prerogative to cut its aid to the schools in half or eliminate it altogether. Such an argument is clearly at odds with the constitutional terminology adopted in 1889. See, supra, note 36. It is also not supported by the historical background as discussed herein. Constitutions are enacted to prohibit something or to authorize something. See, e.g., Apa v. Butler, 2001 S.D. 147, ¶ 36, 638 N.W.2d 57, 70. They are not drafted to be purposeless or accomplish nothing. In re McKennan’s Estate, 25 S.D. 369, 126 N.W. 611, 617 (1910) (“Constitutions are supposed to be prepared with much care and deliberation. It will not do to assume that such important instruments contain any idle or meaningless phrases.”).
id 92.] Thus, if a constitution has a meaning, what is that meaning? Are we to declare that South Dakota is permanently stuck in the school system of 1889 with its country school houses, chalk slates and McGuffey Readers? Certainly not. This Court’s balancing of the application of the scope of Article VIII and the changing trends in education was examined in State ex rel. Prchal v. Dailey:
What would have been considered a good average education in 1881 would not be so considered today. Standards of education have advanced, and methods of teaching have changed. But we think it is elementary that the people through their Legislature and the Constitution have a right to control and prescribe the limits to which they will go in supplying education to the children and youth of the state at public expense. Neither educators nor administrative boards can expend public funds for education, unless the education for which it is expended is authorized by law.
57 S.D. 554, 234 N.W. 45, 47 (1931).
[¶ 93.] While Plaintiffs mount an impressive public policy argument based on equitable principles, this is not an equitable issue. Rather, it is an issue of construction of our Constitution which alone controls the resolution of this case. There certainly is room in the drafting of Article VIII for a difference of legal opinions. However, in this Court’s sole early review of Article VIII, we stated that a statute will be declared unconstitutional in violation of Article VIII only when we are satisfied beyond a reasonable doubt that it conflicts with that article. In re State Bonds, 7 S.D. 42, 63 N.W. 223, 224 (1895). “A reasonable doubt upon the question must be solved in favor of the legislative act, and the act sustained.” Id.[49] We have *649 continued to follow that standard. See, e.g., Tracfone Wireless, Inc. v. S.D. Dep’t of Revenue & Regulation, 2010 S.D. 6, ¶ 22, 778 N.W.2d 130, 137; Metro. Life Ins. Co. v. Kinsman, 2008 S.D. 24, ¶ 18, 747 N.W.2d 653, 661. Today the Court once again properly applies that standard of review. Thus, the words of this Court written shortly after statehood are appropriate:
The object to be sought is the thought of the constitution makers in the use of this expression.... In case of doubt between different constructions claimed for a constitutional or statutory provision, or the meaning of a term, it is always allowable to inquire what results would legitimately follow either, with a view of ascertaining, if possible, whether such consequences were contemplated or intended.
State ex rel. McGee v. Gardner, 3 S.D. 553, 54 N.W. 606, 607 (1893). See also Cummings, 495 N.W.2d at 499.
[¶ 94.] In conclusion, the foregoing establishes: (1) that there was no revolution or even a significant change in education standards by the enactment of Art. VIII in 1889; (2) since 1889 there is no legal or historical basis which supports a claim that prior to the filing of this action the State was out of compliance with Art. VIII; and (3) there is no legal or historical basis to analyze the facts of this case under a different standard than was done by the trial court. Thus, Article VIII sets a constitutional floor for support of education from which the Legislature, not this Court, can ascend.
THE FACTUAL ISSUE[50]
[¶ 95.] Plaintiffs offered evidence from six school districts called “focus districts,” which include the Faith, Doland, Florence, Bon Homme, Willow Lake and Rapid City districts, as proof of state-wide deficiencies in funding compliance with Article VIII.
[¶ 96.] Dr. Rick Melmer was formerly the South Dakota Secretary of Education. While in that position, he testified to visiting over 100 of the 161 school districts in South Dakota. He concluded that the conditions claimed by Plaintiffs to exist in the six focus districts are not representative of the situation around South Dakota.[51] Even if this foundational hurdle is cleared by Plaintiffs, they still have to contend with the trial court’s extensive findings of fact. The trial court entered 433 detailed findings of fact concerning the six focus districts which cover 83 pages. In large part, the trial court concluded the generally negative testimony by superintendents and others from the focus districts was not as probative as other more positive testimony and evidence presented. Its findings are more in conformity with Britton-Hecla’s Superintendent Don Kirkegaard, also a member of the State Board of Education, who testified that, in his opinion, *650 not a single district in the state lacked sufficient resources to prepare its students to find meaningful employment, compete effectively in the economy, have the opportunity for higher education, and function as capable voters and jurors. Suffice it to say that the trial court’s appraisal of those districts was substantially more positive than that of Plaintiffs’ witnesses. This led to a finding by the trial court that each of the focus districts was providing a constitutionally adequate education.
[¶ 97.] The Court today enters into a comparison of the factual evidence submitted to the trial court by the Plaintiffs and the State. The trial court in large part found the factual presentation of the State to be the most probative and entered findings of fact accordingly. Although this Court finds no “clear error” in the trial court’s findings on this subject, the correct analysis should be whether those findings are clearly erroneous. Action Carrier, Inc. v. United Nat’l Ins. Co., 2005 S.D. 57, ¶ 11, 697 N.W.2d 387, 391 (“The trial court’s findings of fact are presumed correct and we defer to those findings unless the evidence clearly preponderates against them.”).
1) Faith School District
[¶ 98.] The Faith School District is located in northwest South Dakota serving students primarily in Meade County. There were 194 students enrolled in the Faith School District during the 2008-2009 school year and the superintendent anticipated enrollment would continue to be stable or decline slightly. The total per-student expenditure for the school year ending in 2007 was $7,688. In 2008, Faith received money under the state-funded sparsity adjustment for the third straight fiscal year. The amount was $90,000 to $100,000. The trial court found classes in Faith were held in a combination of modular classrooms and a gymnasium in its former school building.
[¶ 99.] Plaintiffs rely on testimony from the superintendent of the Faith School District who testified to a lack of sufficient general funds leading to cuts in staff, programs, and services. The superintendent testified to using opt-outs and indicated consolidation was not an option. He further expressed reservations over the effectiveness of televised instruction and concerns over limited course offerings. Finally, the superintendent expressed concern of the expansion of the duties of administrative staff beyond their capabilities.
[¶ 100.] With regard to the superintendent’s testimony over funding cuts, the necessity of opt-outs, and the impracticability of consolidation, the trial court found opt-outs were part of the funding system and that Dupree was 23 miles away and already shared programs with Faith, making consolidation an option. It also found the school had “state of the art technology,” offered a number of classes through interactive television, and that the superintendent himself stressed the student body’s “21st century skills” in a grant application. Although the superintendent showed concern that students had failed language courses taken through televised instruction, he conceded students could fail a live class as well and did not testify to overall failure rates.
[¶ 101.] The trial court found that despite the superintendent’s concerns over limited course offerings, Faith offered all courses necessary for students to qualify for Opportunity and Regent Scholarships and that Faith actually had two Regent Scholars in 2008. It also offered advanced placement courses through the internet. With regard to technical course offerings, the trial court found the school district offered a number of rotating courses through an area services agency in sub *651 jects as diverse as Building Trades and Health Occupations.
[¶ 102.] As to the superintendent’s contentions concerning expansion of the duties of administrative staff, the trial court found Faith had 197 students in its entire K-12 program. This works out to an average class size of 15 students. To administer this system, the superintendent was assisted by an elementary principal and a guidance director and also received management support services from an educational services agency. The trial court found that the school district accepted a large number of students through open enrollment, indicating that the school and its staff were not so overburdened that they could not handle the number of students.
[f 103.] Despite the concerns over funding issues raised by its superintendent, the trial court found that, among other things, the Faith School District provided a constitutionally adequate education. Plaintiffs have not shown that these findings are clearly erroneous.
2) Doland School District
[¶ 104.] The Doland School District is located in northeast South Dakota, primarily in Spink County. The school district had 145 students enrolled in the 2008-2009 school year. Its total per student expenditure for the school year ending in 2007 was $9,022. For the 2006-2007 school year, the trial court found Doland had total general fund expenditures of $1,273,364. That same year, Doland maintained a general fund reserve balance of $644,523, approximately 50% of its annual general fund.
[¶ 105.] Plaintiffs rely on testimony from the superintendent of the Doland School District regarding struggles to meet financial obligations, the necessity of opt-outs, and the impracticability of consolidation. In terms of educational opportunity, the superintendent testified to under-staffing and the necessity of combining elementary classes. Other areas of concern for the superintendent were out-of-date textbooks, cuts in agricultural and technical courses, and understaffing in its two Hutterite colony schools.
[¶ 106.] Although the Doland superintendent expressed concerns over financial struggles, he also testified Doland was not currently facing financial difficulties. Do-land had opted out of the limitation on the general fund levy and the trial court found this gave it the ability to levy for an additional $227,000 every year in addition to state aid formula money. Accordingly, the court found Doland was able to serve its student population in a constitutionally sufficient manner. The court also found the distances between surrounding districts did not pose a barrier to consolidation with three districts within 20 miles of Doland.
[¶ 107.] Regarding understaffing and combining elementary classes, the trial court found Doland had some classes as small as “five or so” students per grade. Thus, the court found “nothing improper” about combining classes. The superintendent’s contentions concerning out-of-date textbooks were addressed by the general fund reserve balance and the fact the district could levy for additional capital outlay funds for books.
[¶ 108.] The trial court attributed the lack of agriculture classes to evidence of declining student involvement in those courses over several years. As for technical courses, the court found the district offered Family and Consumer Science, Personal Finance, Computer Training, and Occupation Prep.
[¶ 109.] Based upon its consideration of the foregoing funding issues, the trial court found Doland was not suffering from financial difficulties and that predictions of *652 future deficiencies were too premature for consideration. It concluded that Doland was providing a constitutionally adequate education. Plaintiffs have not shown that these findings are clearly erroneous.
3) Florence School District
[¶ 110.] The Florence School District is located in northeast South Dakota, primarily in Codington County. The trial court found the Florence School District had 241 students enrolled for the 2007-2008 school year. For the school year ending in 2007, its total per-student expenditure was $7,229.
[¶ 111.] Plaintiffs reference testimony from the Florence superintendent concerning funding difficulties, deficit spending, and lack of sufficient course offerings, extracurricular activities and administrative personnel. The superintendent testified he did not believe Florence was providing an adequate educational opportunity and Plaintiffs buttress that testimony on appeal with references to testimony to the same effect from two state board of education members and a state legislator.
[¶ 112.] As for funding difficulties, the trial court found Florence had a general fund balance of over $300,000 at the time of trial and had not opted out in its tax levies. Thus, an opt-out remained available to it. The court also held consolidation was an option for Florence with two other school districts lying within approximately 20 miles. In that regard, the court noted Florence was already cooperating with nearby school districts in certain course offerings and sporting activities.
[¶ 113.] With reference to course offerings, the trial court found Florence provided all math and science classes required to meet distinguished track curriculum requirements. Although concerns were expressed with televised class offerings, the acceptability of televised instruction did not equate with deficient instruction. Specific concerns with televised physics classes were addressed by employment of an on-site teacher who rotated with another school. As for technical courses, Florence offered agriculture classes at its own school and also provided access to ten different classes at a multi-district facility in nearby Watertown. The Florence superintendent admitted the multi-district classes provided an excellent opportunity for juniors and seniors. Deficiencies in fine arts offerings appeared to be more attributable to televised scheduling issues than lack of resources.
[¶ 114.] The trial court found there were 241 students with less than 20 students per class in the elementary school and high school classes of 12 to 25 students per grade. The superintendent was assisted in his administration of this system by two lead elementary teachers carrying out elementary principal duties.
[¶ 115.] Plaintiffs also reference the testimony of two state board of education members and a legislator who buttressed the superintendent’s criticisms of the Florence School District during pretrial depositions. However, during trial they equivocated in their evaluations after being presented with additional information concerning the conditions and course offerings at the school.
[¶ 116.] The trial court found that, despite the above funding issues, the Florence School District continued to maintain a “healthy” fund balance and provided a constitutionally adequate education. Plaintiffs have not shown that these findings are clearly erroneous.
4) Bon Homme School District
[¶ 117.] The Bon Homme School District is located in southeast South Dakota in Bon Homme County. The trial court found there were approximately 550 students enrolled in the Bon Homme School *653 District for the 2008-2009 school year. The per-student expenditure for the school year ending in 2007 was $7,483.
[¶ 118.] Plaintiffs challenge conditions in the Bon Homme School District, pointing to the superintendent’s concerns over funding difficulties and rejected opt-outs. He also testified that consolidation was not an option. The superintendent indicated Bon Homme had instituted a four-day school week and was experiencing classroom overcrowding with teachers handling as many as 145 students in core classes. As a result, he expressed concerns that teachers were “burning out” and might leave. Plaintiffs sought to buttress the superintendent’s testimony with testimony from a state legislator that the district did not have sufficient funds to meet its expenditures.
[¶ 119.] As for funding difficulties, the trial court found the Bon Homme district received impact aid funds for its needs and made appropriate use of those funds. It further found the district was operating four elementary schools within a 15-mile radius of Tyndall and that three of those schools had very few students. One was a school in a Hutterite colony with only three to ten students in each grade. The other two small schools averaged only seven to eleven students per grade. Thus, as testified to by Dr. Melmer, the trial court found the school district was maintaining too many facilities for the size of its enrollment. It further found that some intra-district consolidation would save transportation, maintenance, and fuel costs, particularly if one or more of the elementary schools were closed. In addition, the court found two other school districts within a 20-mile radius of Tyndall provided additional consolidation options.
[¶ 120.] With regard to the four-day school week, the superintendent testified funding was not the main reason for the change, though it did save some money. Classroom overcrowding occurred in a single geometry class and involved an excess of five or fewer students. The issue did not occur again in a subsequent school year and overall student enrollment was declining. The trial court found no reason to expect overcrowding would occur again and that the issue was moot. The figure of 145 students in core classes was a reference to the total number of students per teacher in some core areas, not the number of students in one class. The overall ratio of students to staff was approximately 13-to-l in 2007. Despite concerns over teachers leaving, the trial court found the average number of years of teaching experience in the district was 14.2 with over 30% of the teachers holding advanced degrees.
[¶ 121.] A legislator’s testimony claimed as supporting the superintendent’s concerns was equivocal as to overall conditions in the Bon Homme School District. While the legislator shared some of the superintendent’s concerns, the trial court found that he also testified the school district was providing an excellent education. Although the legislator testified the school district was under-funded, he further testified it was under-funded in the sense of overspending its resources, not that it did not have sufficient resources. In that regard, the legislator agreed it was not advisable for the school district to operate four attendance centers.
[¶ 122.] Based upon its review of the financial circumstances in the Bon Homme School District, the trial court found the district’s claims of dire conditions and that it would soon be “broke” were premature and that it was providing a constitutionally adequate education. Plaintiffs have not shown that these findings are clearly erroneous.
*654 5) Willow Lake School District
[¶ 123.] The Willow Lake School District is located in northeast South Dakota in Clark County. The trial court found the student body in Willow Lake was small and steadily decreasing. At the time of trial, there were 195 students, which was down from 212 students five years earlier. The school district’s total per-student expenditure for the school year ending in 2007 was $9,066.
[¶ 124.] Plaintiffs rely on testimony from the superintendent for the Willow Lake School District. The superintendent testified that the district was not provided with sufficient funding resources and that consolidation was not an option. He testified about concerns over his workload and a lack of vacation time, budget cuts and salary freezes, the necessity of opt-outs, deficiencies in course offerings, and outdated textbooks.
[¶ 125.] The trial court found the school district was $124,000 short in its general fund. However, it also found that, while the district had opted out so that it could levy up to $200,000 per year in general funds, it was actually levying only $100,000 to $125,000. The court found a complete levy would “go a long way” toward overcoming the shortage. The court also found three schools in a 26-mile radius of Willow Lake that already offered sports on a cooperative basis with the school district and would provide it with consolidation options.
[¶ 126.] The trial court addressed the superintendent’s claims concerning his workload, finding that there were 195 students in the entire school district, i.e., an average of 15 students per class, that the superintendent was assisted by a “capable high school principal,” and that he also received administrative assistance from an educational services agency. The superintendent also testified he was assisted by-a secretary and a business manager. Regarding budget cuts and salary freezes, the trial court found the district lacked funds and made cuts before passing its opt-out and that it had the ability to pass an opt-out sooner and did not do so. It further found the superintendent stated at trial that teacher salaries were competitive for a school of its size.
[¶ 127.] In the area of course offerings, the trial court found that Willow Lake School District provided all classes the students needed to compete for Opportunity and Regent Scholarships. The court found that the school district met the minimum state curriculum standards for math and also offered the requisite units to meet the distinguished criteria for the Opportunity Scholarship. The court also found the school district offered a number of technical courses in family and consumer science and several agriculture courses.
[¶ 128.] Finally, as to out-of-date textbooks, the trial court found textbooks could be purchased with capital outlay or general funds and that the school district had not taken advantage of its ability to raise funds to take care of this issue. Based upon testimony from Dr. Melmer, it further found Willow Lake’s out-of-date textbooks were not representative of conditions around the state.
[¶ 129.] Despite the superintendent’s funding issues regarding the Willow Lake School District, the trial court found that the district was providing a constitutionally adequate education. Plaintiffs have not shown that these findings are clearly erroneous.
6) Rapid City Area School District
[¶ 130.] The Rapid City Area School District (Rapid City) is located in southwest South Dakota in Pennington County. It is the second largest school district in the state. The trial court found that Rap *655 id City operated 15 elementary schools, five middle schools, two traditional high schools, and two alternative high schools. Total enrollment was 13,115 for the 2007-2008 school year. The total per-student expenditure for the school year ending in 2007 was $6,554.
[¶ 131.] No authorized representative of Rapid City testified at trial. Instead, Plaintiffs rely on testimony from a former school board member. Plaintiffs attempted to qualify him as an expert at trial, but the trial court declined to recognize him as such because he did not have a degree in education administration, was not a certified teacher or administrator, and admitted he was not an expert in education administration. Thus, the trial court declined to consider the former board member’s testimony regarding the requirements of No Child Left Behind and the “achievement gap” in Rapid City as expert testimony. Instead, the trial court relied upon the expert testimony of defense expert Dr. John Murphy. Dr. Murphy had reviewed Rapid City, was favorably impressed, and opined that it was providing the opportunity for an adequate education.
[¶ 132.] The former board member complained of insufficient resources, depleted budget reserves, numerous staff cuts, and the removal of vocational offerings to a local technical college. The board member made specific complaints about cuts in the number of guidance counselors, overcrowding, and the loss of a virtual high school program.
[¶ 133.] Rapid City had an excess general fund balance each year from 2001 to 2008 ranging from 9.5% to 15%. At the end of fiscal year 2008, the general fund balance was equal to 10.5% of the total Rapid City general fund budget. The former board member testified that if budgeted sums were fully expended as contemplated by the 2008-2009 preliminary budget, Rapid City would have a general fund excess fund balance at the end of the 2008-2009 school year in the amount of $4,000,000, or 5% of the total budget.
[¶ 134.] • Although Rapid City had made a number of budget and staff cuts, the trial court also found that from 1998 to 2004, the school district experienced a decline of about 1,000 students. The counseling staff was reduced, but the trial court found the state does not require a specific ratio of guidance counselors to students. Foreign language programs were eliminated from the middle schools, but no data was provided as to how elimination of the programs might affect later student performance. There was also conflicting testimony regarding the staff cuts. Although the former board member testified to a reduction in certified staff, Rapid City reports to the State indicated it had hired over 60 new employees in the previous three years and that staff had not declined. The student-to-staff ratio was 16-to-l in the 2006-2007 school year.
[¶ 135.] Despite program cuts, the trial court found that Rapid City had extensive course offerings reflected in a 78-page manual listing high school classes for the 2008-2009 school year.. Rapid City provided the curriculum required by the State Department of Education and provided all course requirements for Opportunity and Regent Scholarships. Contrary to the former board member’s testimony, the trial court found evidence that Rapid City offered a comprehensive range of courses in technical areas, including subjects such as marketing and engineering principles. Vocational offerings at a local technical college were a dual credit opportunity in addition to those courses offered at the high schools.
[¶ 136.] As with the previous focus districts, the trial court found that despite its funding issues, Rapid City was providing a *656 constitutionally adequate education. It further found that many of the former board member’s predictions of financial difficulties predicated upon estimates of future spending were “premature.” Plaintiffs have not shown that these findings are clearly erroneous.
CONCLUSION
[¶ 137.] When one analyzes the legal issue of the meaning of Article VIII and its history, they do not support the heightened legal interpretations advocated by Plaintiffs. Whether or not one accepts the focus districts as representative of the state’s school districts, the trial court’s findings of fact are not clearly erroneous and conclusions of law are not in error. As Plaintiffs fail on both the legal and factual issues, there is no necessity to go further into any causation issues.
[¶ 138.] Article VIII was drawn from the public policy and language of 1889. It may seem today to some to be archaic and incapable of serving the state’s current educational needs and public policy goals. However, this Court is “not concerned with the wisdom or expediency or the need” for this constitutional provision, but only whether it limits the power of the Legislature and, if so, in what manner. Poppen, 520 N.W.2d at 242 (citing Queenside Hills Realty Co., Inc. v. Saxl, 328 U.S. 80, 82, 66 S.Ct. 850, 851, 90 L.Ed. 1096 (1946)). While the meaning of words such as “a general and uniform system of public schools,” “adopt all suitable means to secure the people the advantages and opportunities of education” and a “thorough and efficient system of schools,” may be reviewed in the context of the times as this Court did in Dailey, the words themselves do not change. See Dailey, 57 S.D. 554, 234 N.W. at 48. They set the standard in 1889 and still do today. As Justice Hugo Black once observed concerning the issue of constitutional interpretation:
I realize that many good and able [persons] have eloquently spoken and written, sometimes in rhapsodical strains, about the duty of this Court to keep the Constitution in tune with the times. The idea is that the Constitution must be changed from time to time and that this Court is charged with a duty to make those changes. For myself, I must with all deference reject that philosophy. The Constitution makers knew the need for change and provided for it. Amendments suggested by the people’s elected representatives can be submitted to the people or their selected agents for ratification. That method of change was good for our Fathers, and being somewhat old-fashioned I must add it is good enough for me.
Griswold v. Connecticut, 381 U.S. 479, 522, 85 S.Ct. 1678, 1702, 14 L.Ed.2d 510, 537 (1965) (Black, J., dissenting).
[¶ 139.] The issue of education is a great and weighty one. The United States Supreme Court correctly set forth the limited function of courts in conducting a legal review of the acts of a legislative body and the facts surrounding the adoption of a constitutional or legislative standard. See, e.g., DeCoteau v. Dist. Cnty. Ct. for the 10th Jud. Dist., 420 U.S. 425, 449, 95 S.Ct. 1082, 1095, 43 L.Ed.2d 300 (1975). In light of a claim of “calamitous results” which the parties claimed could flow from the Court’s decision, the Court observed that “these competing pleas are not for us to adjudge, for our task here is a narrow one.... Some might wish [our constitutional drafters] had spoken differently, but we cannot remake history.” Id.
[¶ 140.] The Court holds today that Plaintiffs have failed to establish beyond a reasonable doubt a constitutional violation of Article VIII. I agree. That being the *657 case, our Constitution mandates that these kinds of disputed issues are to be brought before the people’s popularly elected Legislature. That body, and not this Court, is the appropriate forum for resolution of such issues. In so concluding, however, I echo the views of the United States Supreme Court in San Antonio Independent School District:
Nothing this Court holds today in any way detracts from our historic dedication to public education. We are in complete agreement that ‘the grave signifi-canee of education both to the individual and to our society’ cannot be doubted.
411 U.S. at 30, 93 S.Ct. at 1295.
[¶ 141.] For the above reasons, I concur in result.

. See, e.g., Horton v. Meskill, 172 Conn. 615, 376 A.2d 359, 373 (1977); Pauley v. Kelly, 162 W.Va. 672, 255 S.E.2d 859, 878 (1979); Washakie Cnty. Sch. Dist. No. 1 v. Herschler, 606 P.2d 310, 333 (Wyo.1980).

. Contrary to the claim of the State, and as set forth by the Court today, this Court is not without jurisdiction under the separation of powers or political question doctrines. Gray, 2007 S.D. 12, ¶ 18, 727 N.W.2d at 812. See also Baker v. Carr, 369 U.S. 186, 197, 82 S.Ct. 691, 699, 7 L.Ed.2d 663 (1962).

. Language and its meaning can change with time. The Wyoming Supreme Court referenced an 1889 dictionary to aid in interpretation of some of the terms which are now before us:
Uniform: Having always the same form; System: Any combination of assemblage of things adjusted as a regular and connected whole;
Thorough: Fully executed; having no deficiencies; hence, complete in all respects; unqualified; perfect;
Efficient: Acting or able to act with due effect; adequate in performance; bringing to bear the requisite knowledge, skill, and industry; capable, competent.
Campbell Cnty. Sch. Dist. v. State, 907 P.2d 1238, 1258 (Wyo.1995) (citing The Century Dictionary (1889)).
Other terms now before us can be found in case law from that era:
Advantage: Any state, condition, circumstance, opportunity, or means specially favorable to success, property, interest, reputation, or any desired end.
Duvall v. State, 92 Ind.App. 134, 166 N.E. 603, 604 (1929) (citing Century Dictionary). Suitable: Reasonable.
Headley v. Ostroot, 76 S.D. 246, 249, 76 N.W.2d 474, 475 (1956); State ex rel. Richards v. Burkhart, 44 S.D. 285, 183 N.W. 870, 872 (1921).
Opportunity: a fit or convenient time; a time favorable for the purpose, a convenience or fitness of time and place.
In re Guardianship of House v. Wood, 32 Minn. 155, 19 N.W. 973, 974 (1884).
General: Common to many, or the greatest number; widely spread; prevalent; extensive though not universal.
Platt v. Craig, 66 Ohio St. 75, 63 N.E. 595, 595 (1902).
General: Universal, not particularized; as opposed to special.
Joost v. Sullivan, 111 Cal. 286, 43 P. 896, 899 (1896) (citing Black’s Law Dictionary).

. It is unknown why the access to the schools was limited to "white children." While it could be the racial attitudes of the time, hopefully it was because the federal government had already assumed the responsibility for the education of Indian children. See, e.g., Article 4 of the Treaty with Sioux— Sisseton and Wahpeton Bands (1851), reprinted in 1 South Dakota Codified Laws 80; Article 5 of the Treaty with the Sioux — Sisseton and Wahpeton Bands (1858), reprinted in 1 South Dakota Codified Laws 84.

. Two of the few contested issues in the education debates in the 1883 Constitutional Convention concerned a proposal that "all able bodied children between the ages of seven and fourteen be required to attend school at least 3 months each year." Another proposal was that the "Legislature shall provide for uniformity of text books to be used throughout the public schools of this State, and there shall be no change in text books within five years from the date of adoption.” Constitutional Convention of 1883 at 356. Such specific proposals were rejected while the more general terms such as "thorough” survived. Id. at 356-57.

.The proposed Constitution of 1883 was overwhelmingly passed by the voters, 12,336 to 6,814. Kingsbury, History of Dakota Tem-tory, supra, at 1716-17. The United States Senate also passed a bill allowing formal admission of South Dakota as a State. The House of Representatives, however, failed to act and it died.

. Once again the Constitutional proposal was overwhelmingly passed by the voters, 25,-138 to 6,527. Kingsbury, History of Dakota Territory, supra, at 1751. Once again it failed to gain Congressional approval.

. Numerous provisions of the 1885 Constitution were carried forward to the 1889 Constitution and ultimately became enacted as part of the South Dakota Constitution. A significant-concern in 1889 that cautioned against a total reliance upon the 1885 text was the Congressional Enabling Act of 1889, 25 Statutes at Large 676, ch. 180, "which created and prescribed the powers of the 1889 conventions, so often recognized as a limitation on the convention's deliberation....” McDonald v. Sch. Bd. of Yankton Indep. Sch. Dist. No. 1 of Yankton, 90 S.D. 599, 606 n. 3, 246 N.W.2d 93, 97 n. 3 (1976). The Enabling Act does not control the interpretation of Article VIII. However, the Enabling Act did address education by stating, "[t]hat provision shall be made for the establishment and maintenance of systems of public schools, which shall be open to all the children of said states, and free from sectarian control.”

. The 1889 Constitution was hardly controversial at the ballot box. It was approved by the voters 70,131 to 3,267. Jon Lauck, Prairie Republic — The Political Culture of the Dakota Territory 1879-1889, 128 (University of Oklahoma Press 2010).

.The trial court's legal research concluded that the South Dakota constitutional education article is distinct from nearly every other state constitution, including those found in surrounding states such as Minnesota, Montana, Wyoming and North Dakota. On appeal, Plaintiffs do not challenge this conclusion of law. According to Gen. Beadle, he drafted Article VIII based on the "ideas, suggestions and work” of the members of the Committee on Education. Memoirs of Gen. Beadle, supra, at 214. He had previously traveled to other Midwestern states before 1885 and was familiar with their constitutional provisions on education. As draftsman of the 1885 education clause, he accepted the suggestions of the Committee members and, one must assume, borrowed from several states with which he was familiar. The text ' of Article VIII is the result of what he considered to be the best for the proposed State of South Dakota. Id. Other provisions of the 1885 and 1889 Constitutions may have been copied from other states as during the Constitutional Debates on the Bill of Rights, "[w]hen a comparison was made, it was usually with the constitutions of California, Illinois or Iowa.” Gilbert v. Flandreau Santee Sioux Tribe, 2006 S.D. 109, ¶ 21 n. 6, 725 N.W.2d 249, 257 n. 6.

. Five enactments concerning the sale and lease of School and Public Lands were also enacted which had nothing to do with the actual education of students. See 1890 S.D. Sess. Laws chs. 136, 137, 138, 139 & 140.

. An example of the pre- and post-statehood continuity in education appears in Capital Bank of St. Paul v. School-District No. 85, 6 Dakota 248, 42 N.W. 774 (1889), where the Dakota Territorial Supreme Court held school boards possess only such powers as were ex *647 pressly conferred on them by the Territorial Legislature and other powers must necessarily be implied to have been given them in order to carry out the purposes of their organization and are incidental to the exercise of the powers expressly granted to it or necessarily implied. Such legal structure and limits were applied to the school districts after statehood as well. Stephens v. Jones, 24 S.D. 97, 123 N.W. 705, 707 (1909).

. The State’s compliance with Article VIII was challenged under an equal protection argument in Deerfield Hutterian Ass'n v. Ipswich Board of Education, 468 F.Supp. 1219 (D.S.D.1979). It was again challenged as an equal protection claim in Hughes County Sixth Circuit Court in Bezdichek v. State, 1994 S.D.C.C. 34, Hughes County Civ. No. 91-209 (S.D. 6th Jud.Cir.1994). Both challenges were unsuccessful.

. SDCL 13-14-7, 13-6-2(1), 13-6-2(2), 13-6-2(3), 13-1-12.1 and 13-33-19 are some of the examples cited by Plaintiffs.

. Two members of the In re State Bonds Court had also been delegates to a Constitutional Convention, and, in the case of Judge Kellam, all three conventions. Green, 1996 *649 S.D. 146, ¶ 19 n. 10, 557 N.W.2d at 402 n. 10; McDonald, 90 S.D. 599, 246 N.W.2d at 97. The views of these constitutional draftsmen have been found to be "particularly enlightening" in their constitutional scholarship after they joined the South Dakota Supreme Court. Green, 1996 S.D. 146, ¶ 19 n. 10, 557 N.W.2d at 402 n. 10. In McDonald, the Court held that "the likelihood of misapprehension" by Kellam's constitutional analysis "is too remote to be seriously entertained.” 246 N.W.2d at 97.

. We base our decision on the factual record presented to the trial court and not on any subsequent enactments by the Legislature.

. Perhaps for that reason, the trial court also entered extensive findings of fact on the following school districts: Sanborn Central, Miller, Avon, Paulkton Area, Hamlin, Sisseton, White River, McLaughlin, Shannon County, and Flandreau. The trial court found that each of these school districts was providing a constitutionally adequate education.